HUGH S. PEOPLES v. THE DETROIT POST & TRIBUNE Co.

*Libel—Bill of particulars—Justification—Special questions—Proof of murder—Newspaper privilege—Motive, malice and good faith.*

1. A newspaper article, after stating that P. had murdered a certain girl, said she was known as P.'s woman and that he had told an alleged confederate that he need have no fears about her murder and had hired him to steal a sack, which he received [to put her body in] ; that he had furnished a wagon in which to take her body to the river ; that he had intimated to his wife that the girl had been murdered to get rid of her, and that he had confessed adultery to his wife, for which the wife had left him. *Held,* that these were all libelous charges, for which P. was entitled to damages unless it was proved that he had murdered the girl.

2. Two newspapers accused a man of murder and he sued them separately for libel. The affidavit of a convict that he was present when the murder was committed, was procured for one of the cases, but it conclusively appeared that he was elsewhere at the time sworn to, and the affidavit was not used. *Held,* that though it might perhaps be admissible in the other case to show defendant's good faith, it could not be used as proof of the murder.

3. The answer of a jury to a special question is of no account if based on testimony improperly received.

4. Evidence that one accused of murder was in the neighborhood where it took place at the time it was committed and was in such a situation that he might have committed it is not sufficient to show that he did it if no stronger motive is alleged than that he wished to hide an unlawful intimacy indulged before his marriage and to escape liability on a four-hundred dollar note.

5. Newspapers may discuss what relates to the life, habits, comfort, happiness and welfare of the people, and in doing so may state facts, draw inferences therefrom and express views upon the facts. Their deductions, even if false, are not actionable unless they cause special damages, but damage is presumed if they impute the commission of crime.

6. A newspaper statement imputing the commission of crime, but based on facts that have no legal tendency to prove it, is not privileged.

7. In an action for libel based on a newspaper article imputing the murder of a girl, defendant sought to justify by proving it. *Held,* that

the plaintiff, on producing evidence that tended to show that the girl was the victim of an abortion procured by some one else, was entitled to have the case submitted on that theory, and it was error to exclude a question put to a competent witness as to whether the facts shown were inconsistent with death by abortion. *Held,* proper also to cross-examine one who had testified as to the victim's relations with the plaintiff, upon the impressions witness had received therefrom as to her feelings toward this person thus charged with her murder.

8. In an action for newspaper libel questions to the editor as to the purpose of the publication and the publisher's feelings toward the libelled person, and as to what the editor, before publishing the libel, had thought of its veracity, were admissible as bearing on the questions of damages and the malice or good faith of defendant.

9. Where a party has not been limited in his re-examination, the cross-examination thereon may properly be allowed the same latitude.

10. In an action for newspaper libel the editor was properly allowed to testify that at the request of plaintiff's counsel he had previously published a synopsis of the declaration in a similar suit brought by the same plaintiff against another paper.

11. Special questions may properly be submitted to the jury in a libel suit, if the case is a proper one for the jury, to determine whether defendant acted in good faith and with due care.

Error to the Superior Court of Detroit. (Chipman, J.) April 30.—September 23.

CASE. Plaintiff brings error. Reversed.

*Jerome T. Johnson, Geo. H. Penniman, F. A. Baker* and *C. I. Walker* for appellant.

*John Atkinson, Henry M. Cheever* and *Geo. V. N. Lothrop* for appellee.

SHERWOOD, J. This case was an action for libel, charging the plaintiff with the murder of Martha Whitla, and the commission of other crimes and offenses.

The article complained of as containing the libelous matter was published in defendant's paper of July 1, 1881, at the city of Detroit. It contains, substantially, the following charges: (1) That the plaintiff had kept Martha Whitla as his housekeeper and his mistress; (2) that he wanted to get rid of her and prevent her from collecting a note she held

against him for about $400; (3) that he had committed fornication with her; (4) that she was reputed to be the plaintiff's woman; (5) that the plaintiff told one Cronin, who aided him in making preparation for her murder, that he need have no fears because she had been murdered; (6) that plaintiff had employed Cronin to steal a sack to be used about the murder; (7) that plaintiff received the sack, knowing Cronin had stolen it; (8) that plaintiff furnished Cronin with a wagon to take the body to the river in after she had been murdered; (9) that previous to the murder plaintiff's wife had left him because he committed adultery with Martha; (10) that afterwards plaintiff admitted to his wife that he had committed adultery with the girl, and at the time intimated to his wife that Martha had been murdered to get rid of her; and (11) that plaintiff paid money to convict other parties as Martha Whitla's murderers, knowing them to be innocent.

The defendant pleaded the general issue and gave notice under it that the truth of the alleged libelous statements would be proved upon the trial. Subsequently the court made an order to the effect that the defendant file a bill of particulars of the matters the truth of which it proposed to prove under the notice given; and thereupon counsel for defendant, in pursuance of such order, filed a bill, giving in substance the following: (1) That about January 11, 1879, Martha Whitla was in fact murdered at Detroit, and thrown into the river; (2) that on the 12th of March, 1879, her body was found, but not for some time identified; (3) that she had been the housekeeper and mistress of the plaintiff; (4) the truth of the statement in the article concerning the publication by the *Evening News* and the suit thereon; (5) that an investigation was in progress in the police court, in which Marsh was a witness to the matters stated in the article to be provable by him, and that those matters are true; (6) that Martha Whitla was brought to Dearborn by Henry Theiss, January 10, 1879, taken to Detroit next day by Dr. Collar, and was never seen alive after that afternoon.; (7) that the plaintiff contributed $150 to promote the prosecution of

the Theiss boys; (8) that the foregoing facts created and justified a belief by defendant that plaintiff had knowledge of and consented to said murder, and defendant will prove that plaintiff had such knowledge and did so consent.

A number of the alleged libelous charges are not mentioned in the particulars furnished as those to be justified on the trial, among which are what the plaintiff is alleged to have said to Cronin about his need of fear and that the girl had been murdered; that plaintiff employed Cronin to steal the sack, and received it from him, knowing it to have been stolen; that the plaintiff furnished a wagon to take the murdered girl's body to the Detroit river; that plaintiff's wife left him because he committed adultery; that he confessed that crime to his wife and intimated to her that Martha had been murdered to get rid of her, and that Martha was known as Peoples' woman. The record purports to give us the substance of all the testimony taken at the trial, and, as appears therefrom, the justification of these last-mentioned libelous charges was substantially abandoned as no evidence seems to have been given upon either of them. These were all libelous charges, and unless the murder of Martha Whitla by the plaintiff was proved by competent evidence it is difficult to see why the plaintiff should not have been entitled to a verdict.

The murder was not admitted by the plaintiff, neither was there any legal testimony in the case tending to show the plaintiff guilty of the homicide. The affidavit made by Cronin[1] was not proper testimony on that point and it should

---

[1] The defendant introduced in evidence an affidavit of Charles J. Cronin, a copy of which is hereinafter given. It appeared, however, that the original affidavit is in the hand-writing of Charles H. Freeman, an attorney for the *Evening News* in another suit brought by the present plaintiff, and was obtained by said Freeman while said affiant was in the House of Correction at Ionia; that the affidavit was taken before the trial of the case against the *Evening News;* and that Freeman subsequently ascertained that at the time of the supposed murder the affiant, Cronin, was in the Reform School at Lansing.

The affidavit is in the following words:

STATE OF MICHIGAN,  } ss.
COUNTY OF WAYNE.    }

Charles Cronin, being duly sworn, says that during the month of January, 1879, and about the middle thereof, he met Sparling, George F., at 147 Michigan avenue. Sparling talked with me and wanted me

not have been admitted for that purpose. It is the only testimony that tends to show that the plaintiff was knowing to the commission of the crime charged; and while admissible, perhaps, to show good faith on the part of the defendant, it was not competent evidence of any of the facts therein stated. The answer of the jury to the special questions submitted to them upon this point has no bearing upon the case, inasmuch as it was based on testimony improperly received. I think the plaintiff's second request to charge should have been given upon this subject, and its refusal by the court was error. The request was as follows: "There is not sufficient evidence to authorize the jury to find that the plaintiff was guilty of the murder of Martha Whitla, or that he had knowledge thereof or was connected therewith."

Before it can be said that evidence preponderates showing a party to have committed the crime of murder, there must

---

to assist him in taking a body to the river Rouge, and that he and Peoples' hostler were to strangle a girl, named Martha Whitla, who was coming from the country. He asked me to go with him to see Hugh S. Peoples, which I did. We went to Peoples' barn on the corner of Fourth street and Beech, where we found Peoples. He and Sparling talked together a while, and then Peoples asked me if I was willing to take the body to the Rouge. Informed him that I was, and he set the time for us to be at Mrs. Snyder's at 12 o'clock (this was about noon), saying he would have her there at that time ready. About 12 P. M. I hitched up my horse to a wagon owned by Peoples, and at his barn, and hostler and myself drove over to near Mrs. Snyder's. When we went up there I found Martha Whitla sitting in a chair near left hand corner of room. She seemed to be in a stupor. Sparling was sitting near her, and near Sparling, looking out of a window, sat Hugh S. Peoples. Mrs. Snyder and Mrs. Marsh sat near next window. When we got into the room, Peoples nodded to Sparling and the hostler, and they took hold of Martha, and commenced to strangle her. This seemed to wake her up, and she commenced to struggle, and rose to her feet. She was then pushed over by them, and fell on the floor, and they put their knees on her breast and choked her until she ceased to move. Peoples then came over where she lay and bent over her. I then went down to the wagon, and she was tied up and brought down and put in the wagon. Sparling and the hostler got in. We drove to the Rouge bridge. Sparling and the hostler took her out and went down on the ice and put her in the river. We then took the wagon back and separated.

CHARLES J. CRONIN.

Sworn to and subscribed to before me this 16th day of January, 1880.

EDWARD G. RAYMOND,<br>Notary Public,<br>In and for Ionia County,<br>Michigan.

be some evidence tending to show the fact; and when the testimony shows no more than that the party accused was in the vicinity of the crime at the time when it is supposed to have been committed, and in a situation where he might have committed it, with no stronger motive for so doing than to conceal a supposed lascivious intimacy before marriage and to escape responsibility on a note for $400, it does not rise in consequence to the plane of evidence, and should not be submitted to the jury to be weighed by them. This is all that can be properly claimed for that offered as it appears upon the record in this case.

There can be no question at this late day but that the public newspaper has the right (whether it shall be regarded as its duty or not) to discuss those matters which relate to the life, habits, comfort, happiness and welfare of the people. In doing so it may state facts, draw its own inferences and give its own views upon the facts. It may err in its deductions, and if they are false they are not actionable unless special damages can be shown; but false assertions when they impute the commission of crime, are actionable, and when not based upon any facts legally tending to prove the crime imputed the publication cannot be said to be privileged, and such I think is shown to be the case in this record so far as it is sought to connect the plaintiff with the alleged murder. It will not do to say that such a publication was made with reasonable care, however good the motive may have been. The public welfare never required any such reckless disregard of the sacred right of enjoyment of a pure and spotless reputation, which no amount of property can command and which it often takes its possessor a life-time to secure.

The record shows that Martha Whitla was last seen alive in Detroit on the 11th day of January, 1879; that on that day it appears undisputed that she consulted Dr. Duffield, and he made a physical examination which indicated that she was probably pregnant; that such were the indications from what she said to him, and that she wished him to give her medicine to secure a recurrence of the menses, which he refused to do. It further appears from the testimony that she started with

one of the Theiss boys for Dearborn, on the 10th day of January, and on the next day went into Detroit. Dr. Collar says he took her from Dearborn to Detroit on the 11th of January, and the testimony tends to show that she was seen on that day in a buggy with Henry and John Theiss, and that she claimed a marriage engagement with the latter; that she had passed a considerable part of the time during 1878 at his father's house, or near there; and that it was the opinion of several physicians that she had at some time previous to her death been delivered of a fœtus or child.

It was claimed by plaintiff, from these and other circumstances, that there was evidence before the jury in favor of the theory that her death was the result of an abortion. I think there was testimony in the case showing facts in that direction, and tending to support such a theory. The court, however, precluded the jury from the consideration of this being the cause of her death when he instructed them that there was no doubt but that the girl was murdered; and this is claimed as error, and I think it was clearly such. But I do not find any assignment of error covering that part of the charge; neither do I find any request refused relating to the subject by counsel for the plaintiff.

There was, however, a question put to Dr. Yemans by plaintiff s counsel embodying the facts claimed to have been disclosed upon the post-mortem examination and upon the trial relating to this subject, which was objected to, and the objection sustained, which the witness should have been permitted to answer. The question was, whether or not the facts thus " stated were inconsistent with death from abortion." The record shows no ground stated for the objection. The hypothesis contained in the question was sufficiently supported by the testimony. There was no question made of the doctor's ability as an expert, and the question was a proper one as the case then stood. Not only had the plaintiff the right to have the case submitted to the jury upon the theory that the death of the girl was produced by abortion, but also to sustain such theory by any proper testimony for that purpose. I think the exception to the ruling of the court on this question was well taken.

Mr. William Stocking, managing editor of the defendant's paper at the time the libelous articles were published, was sworn on the part of the plaintiff and testified by whom the article was prepared ; that he had conversations with their reporter and city editor before it was published, and as to the circulation of the paper.   Upon the cross-examination witness further testified that the city editor, Mr. Irland, gathered the substance of the information upon which the article was based ; that he did not at that time  know the plaintiff, and had never  heard of him except in connection with the matter of the publication.   The witness was then asked the following questions by counsel for the defendant :

" Was there any feeling on the part of the newspaper against him personally ?"

" What was the object of the publication of these facts ?"

" At the time of the communication to you of the facts, made by them, please state what your own state of mind was in respect to believing them to be true and important ?"

These questions were all objected to as incompetent, and the first, also, as not proper cross-examination.   Although by the course pursued, the plaintiff's interrogatories were upon examination, the record does not show he was limited in the investigation, or in any manner prejudiced thereby.   I think the objections were not well taken.   The testimony called for tended to show the motive and good faith of the defendant, and as such would certainly have been competent on the question of damages, as well as to show there was no malice on the part of defendant.   There was no error in admitting the answer of the witness Irland[1] to the question : " Will

---

[1] *Fred. J. Irland*, city editor, testified as to the publication of the alleged libel, and on cross-examination said that neither plaintiff nor his counsel had communicated with him to correct the statements made in the article, which was published July 31, 1881, a year and a half after the murder; that the suit against the *Evening News* was commenced several months before, and George H. Penniman, who was the attorney for Peoples in that suit, came to witness, and requested him to publish something in relation thereto in behalf of Mr. Peoples, and that witness did publish it.   Defendant's counsel thereupon asked:

" Will you please state what that was?"

This question was objected to as having nothing to do with the case, but the objection was overruled and an exception taken, and the witness replied:

you please state what that was?" It related to the publishing of the declaration in the case against the *Evening News*, and tended to show why the publication was made. It was relevant.

Witness Stringer was interrogated as to the relations of Martha Whitla and her conduct towards the plaintiff, and on his cross-examination was asked: "What impression did her conduct make upon your mind, as to her feelings towards Peoples?" This was objected to as incompetent. It was proper. Her conduct and feelings were material. It had a bearing upon the truth of a portion of the libel charged, and the fact called for frequently becomes perfectly apparent when the circumstances leading to such conclusion are most difficult to describe. *Evans v. People* 12 Mich. 35.

I am unable to perceive anything improper in the questions[2] submitted to the jury by the court for specific answers. They were material facts in the case to be found by the jury (if the case was proper to be submitted to the jury), and either party had the right to a special finding upon each of them.

Something more might be said as to the several charges contained in the libel other than that imputing participation by the plaintiff in the alleged murder, but the views already expressed sufficiently indicate all that is necessary in now disposing of the case.

I think the judgment of the Superior Court should be reversed, and a new trial granted.

The other Justices concurred.

---

"On the day when Major Penniman filed the declaration in the case against the *Evening News*, he came to me and handed me a copy of the declaration. and said he wished I would publish it in the paper, and I published a full synopsis of the manuscript which he gave me."

[2] The special questions submitted to the jury on the part of the defendant were as follows:

Do you find that the paper published the article declared upon in good faith?

Do you find that the defendant exercised due care in collecting the facts published, and published them as matters of public interest, and without actual malice towards the plaintiff?