HARRISON v. ARROW METAL PRODUCTS CORPORATION

Opinion of the Court

1. Labor Relations—Wrongful Discharge—Parties—Joinder of Employer and Union.

A wrongfully discharged union member may maintain an action against his former employer if that employer's conduct in contractual grievance procedures amounted to a repudiation of such procedures, and where that employer's defense is based upon the discharged employee's failure to exhaust union contractual remedies, the discharged employee may join his former employer and his union in one action in a state court, provided he can prove that his union, as bargaining agent, breached its duty of fair representation in its handling of his grievance against that employer.

2. Labor Relations—Wrongful Discharge—Intraunion Remedies —Futility.

A union member may show that it would have been futile to attempt to obtain relief from his wrongful discharge through

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 48 Am Jur 2d, Labor §§ 273–283.
[2, 3, 5, 23–25, 27, 28]   48 Am Jur 2d, Labor and Labor Relations § 356 et seq.
[4, 22] 41 Am Jur, Pleading § 340 et seq.
[6] 33 Am Jur, Libel and Slander § 225.
[7] 33 Am Jur, Libel and Slander § 124.
[8, 9, 14] 33 Am Jur, Libel and Slander § 125.
[10, 12] 33 Am Jur, Libel and Slander §§ 296, 339.
[11] 33 Am Jur, Libel and Slander § 90 et seq.
[13] 33 Am Jur, Libel and Slander § 126.
[15, 20, 21] 33 Am Jur, Libel and Slander § 11 et seq.
[16–18] 33 Am Jur, Libel and Slander § 266.
[19] 33 Am Jur, Libel and Slander § 317 et seq.
[26] 48 Am Jur 2d, Labor and Labor Relations §§ 1296, 1297, 1317, 1320.
[29, 30] 33 Am Jur, Libel and Slander §§ 112, 118, 119.
[31] 33 Am Jur, Libel and Slander § 72.
[32, 33] 33 Am Jur, Libel and Slander § 242.

intraunion remedies when his former employer's defense is
that plaintiff union member failed to exhaust his union rem-
edies before seeing the employer.

3. LABOR RELATIONS—EXHAUSTION OF REMEDIES—PLEADING.
   A wrongfully discharged union member must allege facts from
   which it may be inferred either that he duly exhausted his
   union remedies, or that resort to such remedies would be
   ineffective, if not futile, or that his union breached its
   duty to him of fair representation.

4. MOTIONS—ACCELERATED JUDGMENT—AFFIDAVITS.
   Well-pleaded facts are accepted as true in determining a motion
   for accelerated judgment and contents of affidavits in support
   of that motion may also be considered (GCR 1963, 116.3).

5. LABOR RELATIONS—WRONGFUL DISCHARGE—COURTS—JURISDICTION.
   State courts had jurisdiction where plaintiff-employee, a union
   member, alleged that defendant company had wrongfully dis-
   charged him from his job for theft of company property,
   had libeled, slandered, and blacklisted him, tortiously inter-
   fered with his employment by deceiving other prospective
   employers into believing that he had stolen company property,
   had conspired with defendant union to harm him in his future
   employment, and that defendant union, as sole bargaining
   agent, breached its duty to plaintiff in not giving him fair
   and prompt representation in its handling of his wrongful
   discharge grievance, mandatorily required by defendant's col-
   lective bargaining contract.

6. LIMITATION OF ACTIONS—INTERFERENCE WITH EMPLOYMENT—LI-
   BEL AND SLANDER.
   The wrongful action of a defendant in publishing an accusation
   of theft against a former employee, thus preventing him from
   obtaining other employment, does not constitute a separate
   tort to which the three-year statute of limitations applies, but
   is an aggravation of the damages flowing from the tort of
   libel and slander, subject to the period of limitations that
   applies to that tort.

7. LIBEL AND SLANDER—PRIVILEGE—DEFINITION.
   Privilege, in the law of libel and slander, is not a constant
   but a variable relating to a situation or occasion in which
   the importance of the criticism uttered by a defendant justifies
   a modification or a withdrawal of the protection normally af-
   forded to citizens and their reputations,

8. LIBEL AND SLANDER—ABSOLUTE PRIVILEGE—CLASSES.

Absolutely privileged communications are: proceedings of legislative bodies; judicial proceedings; and communications between military officers.

9. LIBEL AND SLANDER—ABSOLUTE PRIVILEGE—NONACTIONABLE.

A communication absolutely privileged is not actionable even though false and maliciously published.

10. LIBEL AND SLANDER — PUBLICATION — PRIVILEGE — DETERMINATION.

Whether the external circumstances surrounding the publication of defamatory matter are such as to give rise to privilege is for a court to determine and, in so doing, it exercises its normal exclusive function of determining what principles of substantive law are applicable to the situation presented.

11. LIBEL AND SLANDER—PUBLICATION—OCCASION—DEFINITION.

The "occasion" of the publication of defamatory matter refers to time, place and people.

12. LIBEL AND SLANDER—PUBLICATION—OCCASION—PRIVILEGE—DETERMINATION.

When no dispute exists as to the circumstances surrounding the publication of defamatory matter, the court must determine whether privilege justified such publication.

13. LIBEL AND SLANDER—QUALIFIED PRIVILEGE.

A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do.

14. LIBEL AND SLANDER—PRIVILEGE—PUBLIC POLICY.

Public policy, the interest of society, and the social issues at stake are the guideposts in determining whether an occasion creates an interest or duty so as to give rise to privilege in the publication of defamatory matter.

15. LIBEL AND SLANDER—IMPUTATION OF CRIME—CIVIL ACTION.

Publication of a false accusation of theft was actionable *per se* at common law and by statutory enactment the false and malicious imputation to another of the commission of a

crime is a misdemeanor, is impliedly actionable *per se* and subjects the publisher of that defamatory imputation to a civil action for slander (MCLA § 600.2911[1]).

16. LIBEL AND SLANDER—QUALIFIED PRIVILEGE—MALICE—BURDEN OF PROOF.

If the occasion of a libel gives rise to qualified privilege, a plaintiff, before he may recover, must prove both that the defamatory statement was untrue and that it was made with actual malice.

17. LIBEL AND SLANDER—IMPUTATION OF CRIME—PRIVILEGE—BURDEN OF PROOF.

Defendant employer's publication of defamatory statements regarding plaintiff's theft of company property did not give rise to qualified privilege for the publication because the granting of such privilege would have the effect of presuming plaintiff to be guilty and of requiring him to prove, not only his own innocence, but also that defendant employer acted without actual malice in telling plaintiff's prospective employers of the accusation of theft.

18. LIBEL AND SLANDER—IMPUTATION OF CRIME—MALICE—BURDEN OF PROOF.

The serious consequences of a criminal accusation that an employee has stolen employer's property require that the burden of proof rest upon the publisher of that accusation and that a plaintiff's right of action depend upon something more substantial than the nebulous niceties of the existence or nonexistence of malice.

19. LIBEL AND SLANDER—IMPUTATION OF CRIME—PRIVILEGE.

The granting or denying of privilege to an employer who has published statements imputing to a discharged employee the theft of company property depends upon the relative consequences to that employer and employee of such publication and requires consideration of the social issues at stake regarding the sacredness of a person's reputation.

20. LIBEL AND SLANDER — IMPUTATION OF CRIME — MALICE — CONSEQUENCES.

The effect of an unproved accusation of theft against a discharged employee is exactly the same regardless of whether the publishing employer makes the defamatory statement with or without malice, but the publishing employer suffers no consequences whatever by making or not making that ac-

cusation to the discharged employee's prospective employers; therefore the publishing employer's interest and duty as required by reason and the interests of society is that he either refrain from making such an accusation or if it is made be prepared to prove it or to reimburse the accused employee upon failure of such proof.

21. LIBEL AND SLANDER—IMPUTATION OF CRIME—PRIVILEGE—PUBLIC POLICY.

Neither public policy, the interests of society, nor social issues created an interest or duty sufficient to justify defendant employer's publication to plaintiff's prospective employers of a statement accusing plaintiff, a discharged employee, of theft of the publishing employer's property, where the defendant employer, acting as judge and jury, had condemned plaintiff without a hearing and had imposed punishment upon him when justice required that the truth or falsity of that accusation be determined in a proper tribunal.

CONCURRING IN PART AND DISSENTING IN PART

J. H. GILLIS, P. J.

22. MOTIONS—DEFENSES—SUMMARY JUDGMENT—ACCELERATED JUDGMENT.

*Failure to state a claim upon which relief can be granted must be asserted by motion for summary judgment and may not be made by motion for accelerated judgment (GCR 1963, 116, 117).*

23. LABOR RELATIONS — INTRAUNION REMEDIES — EXHAUSTION — BREACH OF CONTRACT — JURISDICTION.

*Failure by a discharged employee to use available intraunion remedies does not bar his institution of a court action seeking damages for breach of the collective bargaining contract by management and union and for the union's breach of a duty of fair representation.*

24. LABOR RELATIONS — DISCHARGED EMPLOYEE — EXHAUSTION OF REMEDIES.

*A wrongfully discharged employee must attempt to exhaust contractual grievance procedure before resorting to the courts in an attempt to assert rights under a collective bargaining agreement.*

25. LABOR RELATIONS — EXHAUSTION DOCTRINE — GRIEVANCE PROCEDURE.

> Application of the exhaustion of union remedies doctrine works an injustice in situations where a union is unwilling to press a grievance claim because of indifference or reluctance to suffer the expense, since it is the union that controls the grievance procedure through which an employee's contract rights are enforced.

26. LABOR RELATIONS — COLLECTIVE BARGAINING — JURISDICTION — FEDERAL LAW.

> State courts have jurisdiction over actions for breach of collective bargaining agreement although federal law must be applied.

27. LABOR RELATIONS—INTRAUNION REMEDIES—ADEQUACY—EXHAUSTION.

> If relief available through intraunion remedies is inadequate, a defense of failure to use those remedies is unsound in law and when an employee's complaint raises a matter that is in the public domain and beyond the internal affairs of the union, those intraunion remedies are plainly inadequate.

28. LABOR RELATIONS—DISCHARGED EMPLOYEE—INTRAUNION REMEDIES—EXHAUSTION.

> Exhaustion of intraunion remedies is not necessary where a discharged employee's complaint implicates not only the union but also the employer in his wrongful discharge.

29. LIBEL AND SLANDER—IMPUTATION OF CRIME—MASTER AND SERVANT—PRIVILEGE—GOOD FAITH.

> An employer is qualifiedly privileged if, in response to an inquiry from a prospective employer, he falsely reports the character of a former employee so long as that communication is made in good faith, for it is permissible to warn a prospective employer of the misconduct or bad character of a former employee.

30. LIBEL AND SLANDER—IMPUTATION OF CRIME—MASTER AND SERVANT—PRIVILEGE—GOOD FAITH.

> The interest of a prospective employer in not hiring thieves, or those who are suspected in good faith of being thieves, is the interest protected by a former employer's qualified privilege in giving that prospective employer information about a former employee's character.

31. LIBEL AND SLANDER—IMPUTATION OF CRIME—MASTER AND SER-
VANT—PRIVILEGE—EMPLOYEE'S CHARACTER.

> *Letter by defendant employer to a prospective employer of plaintiff stating that plaintiff was discharged for theft of company property was qualifiedly privileged as defendant employer had a right to inform the prospective employer of plaintiff's qualifications, morals, and habits, if such information were given in good faith.*

32. PLEADING—MALICE—COURT RULE—LIBEL AND SLANDER—IMPUTA-
TION OF CRIME—MASTER AND SERVANT.

> *Malice may be averred generally under court rule and it is error to dismiss a complaint for failure to allege facts showing malice or facts from which malice might be inferred (GCR 1963, 112.2).*

33. PLEADING—ACTUAL MALICE—LIBEL AND SLANDER—MASTER AND
SERVANT.

> *Actual malice was alleged by plaintiff where he stated that defendant employer had maliciously published a letter to a prospective employer of plaintiff charging plaintiff with theft of company property, knowing that the accusation was false.*

Appeal from Wayne, Joseph G. Rashid, J. Submitted Division 1 October 9, 1968, at Detroit. (Docket No. 3,894.) Decided December 9, 1969. Rehearing denied February 6, 1970. Application for leave to appeal filed February 24, 1970.

Complaint by Ivanhoe Harrison against Arrow Metal Products Corporation, a Michigan corporation, and Local 155, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, for libel and slander. Accelerated judgment for defendants. Plaintiff appeals. Reversed and remanded with instructions.

*Alspector, Sosin & Mittenthal (James R. Barson,* of counsel), for plaintiff.

*Potvin, Tunney & Lawrence (John F. Potvin,* of counsel), for defendant Arrow Metal Products Corporation.

*Stephen I. Schlossberg, John A. Fillion, Bernard F. Ashe,* and *Jordan Rossen,* for defendant Local 155.

Before: J. H. GILLIS, P. J., and R. B. BURNS and J. J. KELLEY,* JJ.

J. J. KELLEY, J. In his complaint, dismissed by an order granting defendants' motions for accelerated judgment, plaintiff alleged substantially as follows:

— On November 1, 1963, plaintiff, who had been employed over nine years by defendant company, filed a workmen's compensation claim for injury and disability. The claim was settled by redemption agreement on July 29, 1964, the scheduled date of hearing.

— For several years plaintiff had been a member in good standing of defendant union.

— Company and union had an agreement or understanding whereby the company gave the union barrels, each containing over 500 pairs of white cloth gloves which the union sold to company employees for five cents per pair. On August 13, 1964, after finding in plaintiff's automobile several pairs of gloves which plaintiff had purchased from the union, company officials falsely accused plaintiff of stealing gloves, and wrongfully discharged him.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

— After defendant company refused to permit plaintiff to return to work, he sought employment elsewhere. When in response to their inquiries, plaintiff told prospective employers that he had worked for defendant company, the latter informed. such prospective employers that he had worked for defendant company, and that he had been discharged by defendant for theft of company property. On August 13, 1964, and numerous times within one year before commencement of this action on May 13, 1966, defendant company libeled and slandered plaintiff, including the writing of . a letter to a prospective employer on April 20, 1966, which stated that plaintiff "was discharged on August 13, 1964, for theft of company property."

— Because plaintiff filed the workmen's compensation claim, company agents, officers and officials conspired to discharge him and to ruin his reputation, and prevented him from obtaining other employment by falsely and maliciously accusing plaintiff of theft when prospective employers sought employment references.

— At the time of plaintiff's discharge there existed between the company and union a contract and working agreement for the benefit of members of the union.

— Defendant company's acts and omissions were part of a wrongful conspiracy wherein company and/or union conspired to harm plaintiff and to deceive plaintiff's prospective future employers into believing he was not honest, thus tortiously interfering with his future employment.

— Defendant company wrongfully discharged plaintiff, libeled, slandered and blacklisted him, and tortiously interfered with his employment by deceiving his prospective employers into believing he had stolen company property. Defendant company

"and/or" defendant union conspired to harm plaintiff, and each of their acts or omissions was part of a wrongful deliberate scheme.

To this complaint defendant company filed an answer denying it had published any such statements. By way of affirmative defenses it pleaded: I. Plaintiff failed to utilize or exhaust remedies available to him under defendant union's constitution and bylaws; II. Plaintiff's complaint alleges conduct within the exclusive primary jurisdiction of the NLRB under the NLRA; III. Statute of limitations; IV. Privilege; V. Truth.

Defendant union did not file an answer, but did file a motion to require plaintiff to furnish a more definite statement of his claims against it. This motion was not decided.

Plaintiff demanded a trial by jury.

Each defendant filed a motion for accelerated judgment, urging as grounds the same matters set forth as company's affirmative defenses I, II, III. The court granted both motions on the grounds alleged, and, as to defendant company, on the further basis that it enjoyed a qualified privilege in writing the letter to plaintiff's prospective employer. Plaintiff appeals, presenting four issues.

## I.

### *Failure to Utilize or Exhaust Remedies Under Defendant Union's Constitution and Bylaws*

*Vaca* v. *Sipes* (1967), 386 US 171 (87 S Ct 903, 17 L Ed 2d 842) was decided after argument on defendants' motions in circuit court and very shortly before their determination. Apparently counsel failed to bring this case to the circuit court's attention.

Having reviewed several cases here cited by defendants, the Court in *Vaca* concluded,[1] that action

---

[1] 386 US 174: "Although we conclude that state courts have jurisdiction in this type of case, we hold that federal law governs * * * *"

*Idem*, 184, 185: "* * * the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement. * * * However, because these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant. The problem then is to determine under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures.

"An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures. * * * In such a situation (and there may of course be others), the employer is estopped by his own conduct to rely on the unexhausted grievance and arbitration procedures as a defense to the employee's cause of action.

"We think that another situation when the employee may seek judicial enforcement of his contractual rights arises * * * if the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if * * * the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance. It is true that the employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our opinion, be a great injustice. We cannot believe that Congress, in conferring upon employers and unions the power to establish exclusive grievance procedures, intended to confer upon unions such unlimited discretion to deprive injured employees of all remedies for breach of contract. Nor do we think that Congress intended to shield employers from the natural consequences of their breaches of bargaining agreements by wrongful union conduct in the enforcement of such agreements. * * *

"For these reasons, we think the wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance. We may assume for present purposes that such a breach of duty by the union is an unfair labor practice, as the NLRB and the Fifth Circuit have held. The employee's suit against the employer, however, remains a § 301 suit, and the jurisdiction of the courts is no more destroyed by the fact that the employee, as part and parcel of this § 301 action, finds it necessary to prove an

lies against the employer if its conduct in contractual grievance procedures amounted to a repudiation of such procedures; and that in the face of a defense based upon failure to exhaust contractual remedies a wrongfully discharged employee may join both his employer and his union in one action in a state court, provided he can prove that the union, as bargaining agent, breached its duty of fair representation in its handling of his grievance. In the face of such a defense, an employee may show that it would have been futile to attempt to obtain relief through intraunion remedies. *Knox* v. *Local 900, UAW-CIO* (1960), 361 Mich 257, 259, 260.

Sufficiency of proof of futility or of union's breach or of company's repudiation depends substantially upon terminology of the union constitution and of the union-company contract. *Cortez* v. *Ford Motor Company* (1957), 349 Mich 108. Although defendants referred to defendant union's bylaws, no copy of them appears in the record.

Defendant union's constitution required it to carry out the provisions of its union-company contracts, and denied its officers, members, representatives or agents any power or authority to counsel, cause, initiate, participate in or ratify any action which constituted a breach of such contract.[2]

---

unfair labor practice by the union, than it is by the fact that the suit may involve an unfair labor practice by the employer himself. The court is free to determine whether the employee is barred by the actions of his union representative, and, if not, to proceed with the case. And if, to facilitate his case, the employee joins the union as a defendant, the situation is not substantially changed."

2 Constitution, Article 19.

"Contracts and Negotiations, Section 1. It shall be the established policy of the International Union to recognize the spirit, the intent and the terms of all contractual relations developed and existing between Local Unions and employers, concluded out of conferences between the Local Unions and the employers, as binding upon them. Each Local Union shall be required to carry out the provisions of its contracts. No officer, member, representative or agent of the International Union or of any Local Union or of any subordinate body of the International Union shall have the power

Defendants' contract provided not only general grievance procedure,[3] but specific action in cases of unjust or discriminatory dismissals.[4] By use of

or authority to counsel, cause, initiate, participate in or ratify any action which constitutes a breach of any contract entered into by a Local Union or by the International Union or a subordinate body thereof."

[3] Company-Union Contract, Article III.—Grievance Procedure.

"Section 1. All complaints or grievances shall be referred to the following steps:

Step 1. (a) Any employee having a grievance or a complaint shall first take it up with the Steward and the Foreman of his department who will attempt to settle it.

(b) If the employee or his steward are unable to make a satisfactory settlement with the foreman within twenty-four (24) hours, the grievance shall then be reduced to writing in triplicate by the steward and each copy shall be signed by the employee and the steward filing the grievance, and two (2) copies shall be given to the foreman.

Step 2. The unsettled grievance shall be taken up by the steward and the foreman consulted in Step 1 together with a member of the Executive Shop Committee and the Superintendent within twenty-four (24) hours and the latter's disposal shall be written on all three (3) copies with his signature. The Superintendent shall dispose of the grievance within forty-eight (48) hours, excluding Saturday, Sunday and holidays, unless the parties agree to an extension.

Step 3. If a satisfactory adjustment is not reached in Step 2, the matter may, within five (5) working days, be taken up at a meeting between the Executive Shop Committee and the Management.

Step 4. If the matter is not satisfactorily adjusted at this meeting, either party may, within five (5) working days, request another meeting and call in outside representatives to assist in settling the dispute. A final decision on the grievance shall be made in writing by the Company within twenty-four (24) hours unless either party requests an extension of time.

Step 5. Failing to reach an agreement at this point, the parties hereto may agree to turn the case over to an impartial arbitrator whose decision shall be final and binding. The expense of the impartial arbitrator shall be borne equally by the Company and the Union.

Grievances or complaints not instituted within thirty (30) days shall be considered void and grievances or complaints not appealed following the Company's decision within five (5) working days in any of the above steps shall be considered closed."

[4] "Section 2. (a) When an employee is discharged or given a disciplinary layoff, the Company shall immediately notify the Executive Shop Committee shift steward of its action.

(b) Complaints regarding unjust and discriminatory dismissals must be filed in writing within twenty-four (24) hours after notification to a union representative of the dismissals and the Company representative must render a decision in writing within forty-

language *mandatory* in form, it *required* the following actions, each being dependent upon those preceding:

A. Upon discharging an employee, company *shall immediately* notify the Executive Shop Committee shift steward.

B. Complaint regarding the dismissal *shall* be reduced to writing in triplicate by the steward,

C. and each copy *shall* be signed by the employee and the steward filing the grievance,

D. and two copies *shall* be given to the foreman *within 24 hours* after notification of the steward by company,

E. and the company representative *must* render a decision in writing *within 48 hours* of its receipt.

Defendant's contract further provided that any grievance or complaint *not appealed following the company's decision within five working days in any of the above steps shall be considered closed.* However, the contract contained no further provision regarding appeal. Articles 31 and 32 of defendant union's constitution provided for appeals, but only to challenge decisions of union bodies.

As to following the first five steps, there was no discretion in union representatives, as was present in *Cortez* v. *Ford Motor Company, supra.*

In a legal action such as the present case, an employee must allege facts from which it may be reasonably inferred either that he duly exhausted his union remedies, or that resort to such remedies would be ineffective, if not futile, or that the union breached its duty of fair representation. *Knox* v. *Local 900, supra; Howland* v. *Local Union 306,*

eight (48) hours (excluding Saturdays, Sundays and holidays) of its receipt.

(c) Any employee found to be unjustly dismissed shall be reinstated and reimbursed at his regular rate of pay for time lost."

*UAW-CIO* (1948), 323 Mich 305; *Vaca* v. *Sipes, supra.*

Upon determination of a motion for accelerated judgment, well-pleaded facts are accepted as true. *Cortez* v. *Ford Motor Company, supra,* 113. Contents of affidavits may also be considered. GCR, 1963, 116.3.

Via affidavit and complaint plaintiff states:

"That his union steward * * * was present when he was discharged and knew that said charges were false and told plaintiff not to worry about anything in that the union 'will push it' and he would get his job back. A meeting of the union members was subsequently held and the membership voted against a strike. However, only about 15 members were present at this meeting.

"Mr. * * * was in charge of the meeting for the union and had told the membership that the union should give Ivanhoe Harrison his job back if it would go on strike. After the strike vote Mr. * * * told Ivanhoe Harrison that 'the union can't do anything for you' and that he would try to get Ivanhoe Harrison a job at General Motors Corporation making more money, which was not done.

"At no time was Ivanhoe Harrison given a copy of the union constitution or bylaws. When he was told by Mr. * * * that there was nothing else the union could do for him after the membership voted against a strike he believed that the matter was ended as far as the union was concerned.

"* * * [P]laintiff has exhausted such administrative remedies as were available to him at the time of filing this action in that all remedies contained and provided for in the said contract and working agreement which have not been attempted by the plaintiff were no longer available to the plaintiff at the time of filing this suit because of the lapse of the specified time periods and because defendant union had failed to take the steps preparatory to obtaining the said remedies as provided in

the said contract and working agreement, although requested by plaintiff to do so."

The steward's personal presence at the time defendant company discharged plaintiff met the requirements of action A. However, it may be reasonably inferred that defendant union failed to follow actions B, C and D. Defendant union's constitution did not bind defendant company. Plaintiff's statements show not only unfair representation by defendant union, but also that an attempt by him to exhaust the multiple time-consuming appellate procedures which the constitution provided[5]

---

5 Constitution, Article 32.  Appeals.

"Section 1.  All subordinate bodies of the International Union, and members thereof, shall be entitled to the right of appeal.  In all cases, however, the decision of the lower tribunal must be complied with before the right to appeal can be accepted by the next tribunal in authority, and shall remain in effect until reversed or modified.  The International President may, upon written application by an appellant waive in whole or in part requirements of such compliance, where unusual circumstances would warrant such waiver.

Section 2.  Any member of any Local Union or unit of an Amalgamated Local Union who wishes to challenge any action, decision or penalty of that body or of any official or representative of that body must, in all cases and procedures where no other time limit is specifically set forth by this Constitution, initiate the challenge before the appropriate body of such Local Union or unit within sixty (60) days of the time the challenger first becomes aware or reasonably should have become aware of the alleged action, decision, or penalty of that body.  *   *   *

Section 5.  Any member feeling himself aggrieved by any action, decision or penalty of his subordinate body shall be entitled to appeal that action, decision or penalty to the International Executive Board only when it has been passed upon by the Local Union membership or delegate body, as the case may be; except where direct appeal to the International Executive Board from some action, decision or penalty of a body other than the Local Union membership or delegate body shall be specifically permitted by another Article of this Constitution.

Section 6.  Any member wishing to appeal from the action, decision or penalty of his subordinate body shall do so in writing within thirty (30) days after the aforesaid action, decision or penalty.  He shall send such appeal to the International Union President and should send a copy of the appeal to the Recording Secretary of the subordinate body.  The appeal shall set forth the basis upon which appeal from the action, decision or penalty of the subordinate body is taken.  The International President shall secure from the

within the *required* 24-hour period, would have been futile. If defendant union did perform actions B, C and D, then any failure of defendant company to

subordinate body a complete statement of the matters in issue, including copies of all charges, and any records, minutes, transcripts of testimony, and other material relating to the appeal.

Section 7. The International Executive Board shall appoint a three (3) man committee to consider the appeal and make recommendations. This three (3) man committee shall be composed of members of the International Executive Board, but shall not include the Regional Director of the region from which the appeal originates. The appeal and any information secured by the International President, pursuant to Section 6 of this Article, shall be forwarded to the committee. After a review of the appeal the committee may hold a hearing, before either the full committee or, in its discretion, one or more of its members, unless the committee concludes that no useful purpose would be served by a hearing, in which event the committee, in its discretion, may make recommendations on the appeal without a hearing. If a hearing is held, it shall be held as close to the locality from which the appeal originates as is possible in order to minimize expense and inconvenience to the appellant. The appellant and appellee (or their representatives) shall be required to appear before the Appeals Committee, with such counsel and witnesses as they may choose, and shall answer fully and truthfully all questions put to them by members of the Appeals Committee. The extent and scope of the hearing shall be such as in the discretion of the committee shall bring to light all facts and issues involved. The appellant and/or appellee shall each be entitled to submit any briefs or any other written statements of position that either of them may wish.

Section 8. The committee shall consider the files and records of the case, and such briefs as may be submitted by either side. Based upon this consideration, the Appeals Committee shall make a recommendation which, together with all of the aforesaid documents, shall be submitted to a nine (9) man committee of the International Executive Board, of which five (5) members shall constitute a quorum. The nine (9) man committee of the International Executive Board shall consider said documents, together with the Appeals Committee recommendation, and shall make a decision on the appeal. Copies of the decision shall be sent to all members of the International Executive Board and the decision shall become the decision of the International Executive Board unless, within ten (10) days, one or more members of the International Executive Board shall raise an objection to the decision, in which case the appeal shall be referred, for decision, to the International Executive Board at its next regular meeting. The International President shall promptly notify all parties concerned of the decision of the International Executive Board.

Section 9. Any subordinate body or member thereof wishing to appeal from any decision of the International Executive Board of an International Trial Committee may, in all cases, take such appeal to the Constitutional Convention of the International Union. The appellant shall, however, have the alternative of appealing such

perform action E may have constituted a repudiation of the contractual grievance procedure.

GCR, 1963, 116.3 prescribes procedure on determination of this issue.

## II.

### *Plaintiff's Complaint Alleges Conduct Within the Exclusive Primary Jurisdiction of the National Labor Relations Board Under the National Labor Relations Act*

*Vaca* v. *Sipes, supra,* compels a contrary conclusion.[6]

---

decision of the International Executive Board or an International Trial Committee to the Public Review Board established in Article 31 of this Constitution in the following cases:   *   *   *

Section 11.  If the appellant elects to appeal to the Public Review Board, the appeal shall be considered by the Board of a panel thereof.  The International President shall forward to the chairman of the Public Review Board all documents and records in the case.  After studying said documents and records, the Board or the panel shall hold a hearing; provided that where the Board or panel concludes after preliminary consideration and/or investigation that the appeal is insubstantial or that no useful purpose would be served by a hearing, the Board may, in its discretion, decide or dismiss the appeal without a hearing.  The extent and scope of the hearing, as well as other matters of procedure and timing, shall be controlled by the rules of procedure which shall be established for such hearings by the full Board pursuant to Article 31, Section 6.

Section 12.  The Board or panel thereof shall, upon due consideration, issue its decision which shall be final and binding upon all parties.   *   *   *   In cases that do involve the processing of grievances, the Board or panel shall first determine whether the specific allegation upon which the appellant claims the Board's or panel's jurisdiction to be based is, or is not, true.  If such allegation is found to be true, the Board or panel shall proceed to dispose of all facets of the appeal; provided that in no event shall the Public Review Board have the jurisdiction to review in any way an official collective bargaining policy of the International Union.  If the Board or the panel shall decide that such jurisdictional allegation is not true, it shall dismiss the appeal in which event the appellant shall, within thirty (30) days of notification of such dismissal, be entitled to appeal the matter to the Constitutional Convention of the International Union; provided that in such appeal, the appellant may not again raise any issue which the Board or the panel negated in its decision dismissing for lack of jurisdiction."

6 386 US 179:  "This preemption doctrine, however, has never been rigidly applied to cases where it could not fairly be inferred

## III.

### *Statute of Limitations*

Filing his complaint on May 13, 1966, plaintiff alleged (1) that on August 13, 1964 and numerous times subsequently and within the past 12 months defendant company libeled and slandered plaintiff, and (2) that on April 20, 1966, it published the letter previously mentioned, which stated that he had been discharged for theft of company property.

Plaintiff contends that defendant company's actions in preventing him from obtaining employment constituted a tort to which the three-year statute of

---

that Congress intended exclusive jurisdiction to lie with the NLRB. Congress itself has carved out exceptions to the Board's exclusive jurisdiction * * * In addition to these congressional exceptions, this Court has refused to hold state remedies preempted 'where the activity regulated was a merely peripheral concern of the Labor Management Relations Act. * * * (or) touched interests so deeply rooted in local feeling and responsibility that in the absence of compelling congressional direction, we could not infer that Congress has deprived the States of the power to act.' * * * See, *e.g., Linn v. United Plant Guard Workers of America, Local 114,* 383 US 53, 86 S Ct 657, 15 L Ed 2d 582 (libel) * * * "

*Idem,* at 183: "There are also some intensely practical considerations which foreclose preemption of judicial cognizance of fair representation duty suits, considerations which emerge from the intricate relationship between the duty of fair representation and the enforcement of collective bargaining contracts. For the fact is that the question of whether a union has breached its duty of fair representation will in many cases be a critical issue in a suit under L.M.R.A. § 301 charging an employer with a breach of contract. To illustrate, let us assume a collective bargaining agreement that limits discharges to those for good cause and that contains no grievance, arbitration or other provisions purporting to restrict access to the courts. If an employee is discharged without cause, either the union or the employee may sue the employer under L.M.R.A. § 301. Under this section, courts have jurisdiction over suits to enforce collective bargaining agreements even though the conduct of the employer which is challenged as a breach of contract is also arguably an unfair labor practice within the jurisdiction of the NLRB. *Garmon* and like cases have no application to § 301 suits. *Smith* v. *Evening News Assn.,* 371 US 195, 83 S Ct 267, 9 L Ed 2d 246.

"The rule is the same with regard to preemption where the bargaining agreement contains grievance and arbitration provisions which are intended to provide the exclusive remedy for breach of contract claims."

limitations applies.   This contention cannot be sustained.

"If one is prevented by the wrongful act of a third party from securing some employment he has sought, he suffers a legal wrong, provided he can show that the failure to employ him was the direct and natural consequence of the wrongful act.   The difficulty here is that this will in general be a consequence of some other legal wrong, and will constitute an aggravation of damages rather than a distinct cause of action.   Thus, the libel of a servingman may induce one needing his services to refuse him employment: but here the libel is proof that special damage has flowed from it."   2 Cooley On Torts (4th ed), § 225, p 179.

## IV.

### *Privilege*

"There are few areas of the law so obscure in detail as that of the law of defamation."[7]

Defendant company claims that it had a qualified privilege to write the letter of April 20, 1966, to plaintiff's prospective employer.   This contention is here considered as a motion for partial summary judgment under GCR 1963, 117.2(1).

The term privilege relates to a situation or occasion in which the importance of the criticism published justifies a modification or indeed a withdrawal of the protection normally afforded to our citizens' reputations.   The privilege thus afforded is not, however, a constant.   It varies with the situation. At one extreme we have loose gossip, thoughtless or malevolent.   Here there is no privilege.   At the opposite extreme we have absolute privilege.   In

---

[7] *Lawrence* v. *Fox* (1959), 357 Mich 134, 136.

between we have qualified privilege. *Lawrence* v. *Fox* (1959), 357 Mich 134, 140.

Cases of absolute privilege fall into three classes: (1) proceedings of legislative bodies; (2) judicial proceedings; and (3) communications between military officers. *Timmis* v. *Bennett* (1958), 352 Mich 355, 362, 363. A communication absolutely privileged is not actionable, even though false and maliciously published. *Trimble* v. *Morrish* (1908), 152 Mich 624, 627. *Lawrence* v. *Fox, supra,* 137.

A qualified privilege extends to communications made under certain circumstances.

It is for the court to determine whether or not the occasion, that is, the external circumstances surrounding the publication, is such as to give rise to privilege. In so doing, the court is exercising its normal exclusive function of determining what principles of substantive law are applicable to the situation presented. The term *occasion* refers to time, place and people. *Lawrence* v. *Fox, supra,* 139, 140.

Initially the defendant carries the burden of establishing an occasion of privilege. If the facts are in dispute, the jury is called upon to determine them. It is for the court, however, to decide whether the facts found by the jury made the occasion privileged, or to instruct the jury as to what facts they must find in order to hold the occasion privileged. Where, as here, no dispute exists as to the circumstances surrounding the publication, the court must determine whether privilege justified it. *Lawrence* v. *Fox, supra,* 140, 141.

Although it does not appear that any Michigan appellate court has decided the identical issue here presented, such a court has considered publications in cases involving employer-employee relationships.

In *Sias* v. *General Motors Corporation* (1964), 372 Mich 542, it held that a corporation-employer had

no interest sufficient to justify its statement that an employee was discharged for "misappropriation of company property," made to remaining employees for the purpose of restoring morale among them.

*Carroll* v. *Owen* (1914), 178 Mich 551, differs from the instant case. In *Carroll* there was no accusation of criminal conduct. There counsel agreed that the prior employer had a qualified privilege; not so here. In *Carroll* the Court said only that the prospective employer "having rented defendant's house for the winter season, and wishing to retain some or all of the servants," it was the prior employer's right to inform the prospective employer as to the prior employees' "qualifications, morals, and habits." These are not the same circumstances as in the present case, nor does the *Carroll* opinion sanction privilege in the accusation of commission of a crime.

The present occasion differs from those in *Trimble* v. *Morrish, supra,* and *Livingston* v. *Bradford* (1897), 115 Mich 140.

As observed in Newell, Slander and Libel (4th ed), § 345, p 383:

"'The theory of privilege involves a variety of conditions of some nicety, and also a doctrine not always of easy application to a set of facts   *   *   *   .'"

Although in several early Michigan cases the question of qualified privilege arose, the Court first propounded a rule on this topic in *Bacon* v. *The Michigan Central Railroad Company* (1887), 66 Mich 166, 170, after tracing it back into English law:

"Qualified privilege exists in a much larger number of cases. It extends to all communications made *bonà fide* upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege em-

braces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation."

The principles underlying this rule have been stated in various forms.

Perhaps to help explain a nonlegal duty "of a moral or social character of imperfect obligation" the court in *Bostetter* v. *Kirsch Company* (1948), 319 Mich 547, 558, quoted the following more expanded rule which appears in 17 R.C.L. § 88, p 341 and in 33 Am Jur, p 124:

" 'A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do.' "

After reviewing privilege, the court in *Lawrence* v. *Fox, supra,* 137, 138, concluded:

"This defense rests upon considerations of public policy.  *  *  *

"The privilege thus afforded is not, however, as the mathematicians would put it, a constant. It varies with the situation, with what is regarded as the importance of the social issues at stake."

Extracted from the foregoing, guideposts in determining whether an occasion creates interest or duty so as to give rise to privilege, are public policy, the interests of society and the social issues at stake.

In singling out and making special provision for the same type of libel alleged by the plaintiff, Mich-

igan, through legislative enactment,[8] has clearly expressed its policy to be one of condemnation of such conduct. By common law the publication of a false accusation of theft is actionable *per se.*  *Sias* v. *General Motors Corporation, supra,* p 547.

A still broader public policy should be considered. If the occasion of the libel gives rise to qualified privilege, then before a plaintiff may recover, he must prove both that the statement was untrue and that it was made with actual malice.  *Bufalino* v. *Maxon Brothers, Inc.* (1962), 368 Mich 140, 154. In American jurisprudence a man is presumed innocent of a criminal accusation until proven guilty. Granting of privilege here would have the effect of presuming the plaintiff to be guilty and of requiring him to prove, not only his own innocence, but also that defendant employer acted without actual malice. The serious consequences of such an accusation require that the burden of proof rest upon the publisher thereof, and that an employee's right of action depend upon something more substantial than the nebulous niceties of the existence or nonexistence of malice.[9]

---

[8] CL 1948, § 750.370 makes it a misdemeanor for any person falsely and maliciously to impute to another the commission of a crime.  Further, MCLA § 600.2911 (1) impliedly recognizes that such imputation is actionable *per se* and subjects the publisher to a civil action for slander.

[9] "[A] communication being shown to be privileged, it lies upon the plaintiff to prove malice in fact; that, in order to entitle him to have the question of malice left to the jury, he need not show circumstances necessarily leading to the conclusion that malice existed, or such as are inconsistent with its nonexistence, but they must be such as raise a probability of malice, and be more consistent with its existence than its nonexistence; and in *Cooke* v. *Wildes,* 5 El. & Bl. 329, it was held that if the occasion creates such privilege, but there is evidence of express malice, either from extrinsic circumstances or from the language of the libel itself, the question of express malice should be left to the jury.  In actions for defamation, malice is an essential element in the plaintiff's case.  But in these cases the word "malice" is understood as having two significations; one, its ordinary meaning of ill will against a person, and the other its legal signification, which is a wrongful act done intentionally, without just cause or excuse.  These distinctions have

The *Bacon* rule's determination of privilege on the basis of employers' interest only, excludes an equally important segment of society, the employee. Decision as to whether the occasion imposes a duty to publish must rest in part upon consideration of this same segment.

Weighing the relative consequences to the employer and the employee, of granting or denying privilege, aids in deciding which would further the interests of society. This process requires consideration of the social issues at stake.

"Every man's reputation is as sacred as his property." *Foster* v. *Scripps* (1878), 39 Mich 376, 381.

"The public welfare never required any such reckless disregard of the sacred right of enjoyment of * * * reputation, which no amount of property can command and which it often takes its possessor a lifetime to secure." *Peoples* v. *Detroit Post & Tribune Co.* (1884), 54 Mich 457, 462.

Contemplate the effect of an accusation, as here made, upon the future life of the employee. Any prospective employer generally requires an applicant to furnish the names of all prior employers.

---

been denominated *malice in fact* and *malice in law*. The first implies a desire and an intention to injure; the latter is not necessarily inconsistent with an honest purpose, but, if false and defamatory statements are made concerning another without sufficient cause or excuse, they are legally malicious, and in all ordinary cases malice is implied from the defamatory nature of the statements and their falsity. The effect, therefore, of showing that the communication was made upon privileged occasion is *prima facie* to rebut the quality or element of malice, and casts upon the plaintiff the necessity of showing malice in fact, that is, that the defendant was actuated by ill will in what he did and said, with a design to causelessly or wantonly injure the plaintiff,—and this malice in fact, resting, as it must, upon the libelous matter itself and the surrounding circumstances tending to prove fact and motive, is a question to be determined by the jury. The question whether the occasion is such as to rebut the inference of malice if the communication be *bona fide* is one of law for the court; but whether *bona fides* exist is one of fact for the jury." *Bacon* v. *Michigan Central Railroad Co.* (1887), 66 Mich 172, 173.

In one way or another, the prospective employer usually contacts prior employers. This one unproved accusation could then become the basis for permanently depriving a man of his dignity, good name, self-respect and right to earn for the support of himself and his family. Whether the employer publishes with malice or without it, the effect on the employee is exactly the same.

On the other hand, the publishing employer suffers no consequences whatever, either by making or by not making the unproved accusation. The prospective employer may suffer consequences if such an accusatory statement is not made, but only if it is true. The publishing employer's interest and duty, imperfect or otherwise, but required by reason and the interests of society, are either to refrain from making the statement or if it is made, then to be prepared either to prove it or to reimburse the employee upon failure of such proof.

The employer would not be liable under all conditions. It has been said that a charge imputing conviction of an offense, if there has been a conviction, is justified regardless of whether plaintiff was in fact innocent of the offense, or whether the court had jurisdiction. *Mattheis* v. *Hoyt* (WD, Mich, 1955), 136 F Supp 119, 124. Recovery cannot be predicated upon defamatory charges which are proved to be true. *Cochrane* v. *Wittbold* (1960), 359 Mich 402, 409. If the employee consents to publication, it is absolutely privileged. *Schechet* v. *Kesten* (1966), 3 Mich App 126, 133.

"Society is organized and courts established for the protection of the rights of individuals. It is all very well to advance the interests of * * * a class, and afford them information which will reasonably protect them from loss. But there is no principle of justice or of law which requires this to be done

at the expense of the individual.  It would be a harsh and tyrannical rule that would protect one person from loss at the pecuniary ruin of another.  The welfare of society does not require that a few * * * shall thrive by the sacrifice of many or of any * * * ." *Pollasky* v. *Minchener* (1890), 81 Mich 280, 287.

Neither public policy nor interests of society, nor social issues, created an interest or duty sufficient to justify defendant corporation's publication of the theft accusation.  Acting as jury and judge, this defendant condemned plaintiff without a hearing and imposed punishment.  The administration of justice requires that the truth or falsity of such an accusation, made under circumstances here present, be determined in a proper tribunal.

Affirmed as to the issue of the statute of limitations.  As to the remaining issues, reversed and remanded for proceedings not inconsistent with this opinion.  Costs to appellant.

R. B. Burns, J., concurred.

J. H. Gillis, P. J. (*concurring in part and dissenting in part*).  I am in entire agreement with my colleagues that the trial court erred in concluding that plaintiff's complaint alleged conduct within the exclusive jurisdiction of the National Labor Relations Board.  I also agree that the applicable statute of limitation in this case is the one-year limitation period for libel or slander.  I treat the remaining issues under separate headings.

I

## Failure to Utilize or Exhaust Remedies Available Under the Union's Constitution

However inartistically drawn, count I of plaintiff's complaint attempts to state a claim based upon breach by defendant employer of its collective bargaining agreement and breach by defendant union of its duty of fair representation. See *Humphrey* v. *Moore* (1964), 375 US 335 (84 S Ct 363, 11 L Ed 2d 370); *Vaca* v. *Sipes* (1967), 386 US 171 (87 S Ct 903, 17 L Ed 2d 842). It contains the following well-pleaded allegations which, for purposes of this appeal, we must accept as true. See *Cortez* v. *Ford Motor Co.* (1957), 349 Mich 108.

On August 13, 1964, plaintiff Ivanhoe Harrison was discharged from his job by his employer, defendant Arrow Metal Products, for alleged theft of company property. He was accused of stealing several pairs of cloth gloves which were discovered by company officials after a search of plaintiff's automobile. Plaintiff denied the company's accusation and asserted that he had purchased the gloves from his union representative. That gloves were found in plaintiff's car was not unusual, since many employees regularly purchased several pairs of gloves a day from their union for use in their work and stored the gloves in their automobiles because of insufficient locker space.

At the time of plaintiff's discharge there was in effect a collective bargaining agreement between defendant company and defendant local 155, UAW, plaintiff's collective bargaining representative. The agreement prohibited unjust discharge and contained provisions establishing grievance procedure

in cases involving alleged unjust dismissal.[1] Plaintiff requested his union to prosecute a grievance on his behalf. However, the union failed to invoke the contractual grievance procedure.[2]

For purposes of this appeal, we must likewise assume that defendant union breached its duty of fair representation when it refused to invoke the contractual grievance procedure on behalf of plaintiff.[3] Several reasons require this assumption. First, as this case reaches us, the sufficiency of plaintiff's complaint to state a breach by defendant union of its duty of fair representation has not been tested.[4] Because a defense of failure to state a claim must be asserted by motion for summary judgment under GCR 1963, 117, and may not be made by motion for accelerated judgment under GCR 1963, 116, *Drouillard* v. *City of Roseville* (1967), 9 Mich App 239, no opinion can be expressed as to whether plaintiff sufficiently alleged bad faith, arbitrary ac-

---

[1] Article III of the collective bargaining agreement established a five-step procedure for the handling of all complaints or grievances. In step one, either the aggrieved employee or the union representative presents the grievance to the company's department foreman. If settlement is not reached, the grievance is reduced to writing and further prosecuted by union representatives. Under article III, it is apparent that only the union had the right to invoke the higher steps of the grievance procedure.

[2] In his affidavit in support of his answer to defendants' motions for accelerated judgment of dismissal, plaintiff swore that his union steward was present when he was discharged and that his steward knew the charge was false. Plaintiff was told that the union would "push it;" however, after the union membership voted not to strike in support of plaintiff's grievance, plaintiff was informed that nothing could be done for him.

From the record in this case, it does not appear whether any grievance was actually filed on plaintiff's behalf. However, for purposes of this appeal, we must accept as true plaintiff's allegation that, although requested to do so, the defendant failed to invoke the contractual grievance procedure. See *Cortez* v. *Ford Motor Co.* (1957), 349 Mich 108.

[3] See note 2, *supra*. *Cf*. Cox, "Rights under a Labor Agreement" (1956), 69 Harv L Rev 601, 652; *Vaca* v. *Sipes* (1967), 386 US 171, 191, 194 (87 S Ct 903, 917, 919, 17 L Ed 2d 842, 858, 860).

[4] *Cf*. *Field* v. *Local 652 UAW AFL-CIO* (1967), 6 Mich App 140, 143.

tion, or fraud on the part of defendant union.[5] Furthermore, defendant union has proceeded both in the trial court and on this appeal upon the assumption that it breached its duty of fair representation.[6]   Thus, the issue of law presented is: may a union member sue his union for allegedly not properly processing his grievance without first utilizing or attempting to exhaust his intraunion remedies?   For reasons hereafter discussed, I agree with my colleagues that plaintiff's failure to utilize available intraunion remedies does not bar institution of a court action seeking damages for breach of contract and for breach of the duty of fair representation.

It is well settled that a wrongfully discharged employee must attempt to exhaust contractual grievance procedure before resorting to the courts in an attempt to assert rights under a collective bargaining agreement. *Republic Steel Corp.* v. *Maddox* (1965), 379 US 650 (85 S Ct 614, 13 L Ed 2d 580); *Field* v. *Local 652 UAW AFL-CIO* (1967), 6 Mich App 140; see annotation "Exhaustion of grievance procedures or of remedies provided in collective bargaining agreement as condition of employee's resort to civil courts for assertedly wrongful discharge," 72 ALR2d 1439.   The prerequisite of exhaustion of contractual grievance procedure is designed to encourage union responsibility and to protect employers who, acting in good faith and in accordance

---

[5] *Cf. Kennedy* v. *UAW AFL-CIO Local 659* (1966), 3 Mich App 629, 632.

[6] "While plaintiff has not pleaded a cause of action against defendant union, for purposes of defendants' amended motion only, defendant local union assumes *arguendo* that it somehow did wrong to plaintiff."   Brief for defendant local 155.   On oral argument counsel for the union stated: "Nevertheless, even though it is our belief that there is absolutely no cause of action against the union here, we have not made that defense, because that's a different motion.   We are willing to assume that somehow local 155 wronged the plaintiff."

with their bargaining agreements, are entitled to rely upon the contract's grievance procedure, rather than court litigation, for settlement of employee claims. See *Field* v. *Local 652 UAW AFL-CIO, supra,* at 146. However, since it is the union that controls the grievance procedure through which an employee's contract rights are enforced,[7] application of the exhaustion doctrine "would work an injustice in situations where the union is unwilling to press the claim because of indifference or reluctance to suffer the expense." Cox, "Rights under a Labor Agreement" (1956), 69 Harv L Rev 601, 652. Only in those situations in which the union has in good faith made an adjustment of the grievance, see *Cortez* v. *Ford Motor Co., supra,* at 120, or is satisfied that the grievance lacks merit, see *Vaca* v. *Sipes, supra,* at 193 (87 S Ct at 918, 17 L Ed 2d at 859, 860), is application of the doctrine of exhaustion sound. Otherwise there are grave risks in giving to the union untrammelled control over grievance prosecution. "[T]he individual employee  *  *  *  may be caught in the middle between a powerful union and a powerful employer." *Field* v. *Local 652 UAW AFL-CIO, supra,* at 145.

In *Vaca* v. *Sipes, supra,* the United States Supreme Court provided a measure of relief for those who, like plaintiff in this case, are precluded from resort to the contract's grievance machinery by the wrongful refusal of their union to process an employee grievance. It was there held:

"We think that another situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has

---

[7] "As a matter of practice, if not in legal theory, the union also controls the grievance procedure through which a man's contract rights are enforced." Cox, "The Role of Law in Preserving Union Democracy" (1959), 72 Harv L Rev 609, 611. And see note 1, *supra.*

sole power under the contract to invoke the higher stages of the grievance procedure, *and* if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance. It is true that the employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our opinion, be a great injustice." *Vaca v. Sipes, supra,* at 185–186 (87 S Ct at 914, 18 L Ed 2d at 855).

However, the defense considered by the Court in *Vaca,* failure to secure relief through *contractual* remedial procedures, see *Vaca* v. *Sipes, supra,* at 185 (87 S Ct at 914, 17 L Ed 2d at 855), is not that which is here asserted. The union in its brief concedes that in this case plaintiff had exhausted his contractual remedies: "We agree that plaintiff could no longer pursue his contractual remedies against employer because his union withdrew his contractual grievance." Both defendants in this case attempt to shield themselves from suit by emphasizing plaintiff's failure to resort to available intraunion remedial procedures.[8] Arguably, *Vaca* v. *Sipes, supra,* is distinguishable, for nowhere in *Vaca* is this defense discussed.

In support of their position, defendants cite our decisions in *Kennedy* v. *UAW AFL-CIO Local 659* (1966), 3 Mich App 629, and *Field* v. *Local 652 UAW*

---

[8] It is evident from the record in this case that plaintiff did not pursue intraunion relief.

*AFL-CIO, supra.* While those decisions can be distinguished from the present case,[9] I agree that, standing alone, they would require dismissal of plaintiff's action for failure to exhaust intraunion remedies. I am of the view, however, that recent pronouncements of the United States Supreme Court indicate that Federal law would permit plaintiff's action in this case and, in light of those decisions, I examine anew the issue presented in *Kennedy, Field,* and this case.[10]

The subject matter of plaintiff's suit against defendant Arrow is breach of a collective bargaining agreement. Although state courts have jurisdiction over such suits, *Charles Dowd Box Co., Inc.* v. *Courtney* (1962), 368 US 502 (82 S Ct 519, 7 L Ed 2d 483); *Smith* v. *Evening News Association* (1962), 371 US 195 (83 S Ct 267, 9 L Ed 2d 246), it is Federal law which must be applied. *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America* v. *Lucas Flour Co.* (1962), 369 US 95 (82 S Ct 571, 7 L Ed 2d 593); *Humphrey* v. *Moore, supra; Field* v. *Local 652 UAW AFL-CIO, supra.* While plaintiff joined the union as a defendant, the gravamen of his complaint is defendant Arrow's wrongful discharge. His action remains a suit for breach of contract, and the situation is not substantially changed. *Vaca* v. *Sipes, supra,* at 187 (87 S Ct at 915, 17 L Ed 2d at 856).

Section 101(a)(4) of the Labor-Management Reporting and Disclosure Act of 1959[11] provides:

---

[9] In *Kennedy,* plaintiff had not pleaded bad faith, arbitrary action, or fraud on the part of his union. In *Field,* the defense of failure to plead facts upon which relief could be granted was raised by the defendants.

[10] See Sachs, "Labor Law" (1967), 14 Wayne L Rev 161.

[11] 29 USCA (1965) § 411(a) (4). In its brief, the union contends that the LMRDA is not an issue in this case. I agree to the extent that plaintiff's complaint charges no violation of rights secured by Title I of the Act. See *Allen* v. *Local 820 Armored Car Chauffeurs and Guards* (D NJ, 1960), 185 F Supp 492. This should not, how-

"No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency * * * or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator; *Provided,* That any such member *may be required to exhaust reasonable hearing procedures* (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings." (Emphasis supplied.)

Recently, the United States Supreme Court interpreted this provision as installing in the field of labor-management relations a doctrine of exhaustion of intraunion remedies comparable to that which prevails in other areas of law before the federal courts. In its discretion, a court may require that an aggrieved employee first seek relief within his union. However, it is the responsibility of that same court to determine whether the available intraunion remedies are "reasonable" in the light of the circumstances of each case. *National Labor Relations Board* v. *Industrial Union of Marine and Shipbuilding Workers of America, AFL-CIO* (1968), 391 US 418, 426–428 (88 S Ct 1717, 1722–1723, 20 L Ed 2d 706, 713–714). If it appears that the relief available through intraunion remedies is inadequate, see *Greene* v. *United States* (1964), 376 US 149 (84 S Ct 615, 11 L Ed 2d 576); *McNeese* v. *Board of Education for Community Unit School District 187, Cahokia, Illinois* (1963), 373 US 668 (83 S Ct 1433, 10 L Ed 2d 622), the defense of failure to utilize those remedies is unsound as a matter of law. Moreover,

---

ever, preclude resort to judicial analysis of the exhaustion requirement under the LMRDA where, as in this case, the reasoning of such analysis likewise applies.

"When the complaint  *  *  *  raises a matter that is in the public domain and beyond the internal affairs of the union, the union's internal procedures are  *  *  *  plainly inadequate." *National Labor Relations Board* v. *Industrial Union of Marine and Shipbuilding Workers of America, AFL-CIO, supra,* n 8 at 426 (88 S Ct at 1723, 20 L Ed 2d at 713).

I would hold that the intraunion remedies available to plaintiff in this case were "plainly inadequate."

Article 32 of the UAW Constitution guarantees to every member of the UAW local the right of appeal from any action of his local union. Specifically, intraunion appellate procedure is available in cases of "inaction relative to the processing of a grievance, in which the appellant has alleged  *  *  *  that the grievance was improperly handled because of fraud, discrimination, or collusion with management." UAW Constitution, art 32, § 9. Impartial review in such cases is provided by the Public Review Board (PRB), a body independent of the UAW. UAW Constitution, art 31. Under this provision, it is apparent that plaintiff could have carried his cause to intraunion appellate authorities. Moreover, the jurisdictional limitation upon the intraunion review available—that, in order to invoke the aid of the PRB, an aggrieved member must first allege "fraud, discrimination, or collusion with management"—is consonant with the requirement that, in order to invoke the aid of a court, a wrongfully discharged employee must first allege and prove bad faith representation by his union. *Vaca* v. *Sipes, supra.* A holding of inadequacy cannot rest upon this ground.[12]

Additional limitations, however, upon the scope of the intraunion review available present more serious problems. Suppose, for example, that the charge

---

[12] See Brooks, "Impartial Public Review of Internal Union Disputes: Experiment in Democratic Self-Discipline" (1961), 22 Ohio St L Rev 64, 91–92.

of unfair representation concerns the policies pursued by a union in negotiating a particular bargaining agreement. It is alleged that the agreement reached is discriminatory—that the union arbitrarily favored one group of union members. See *Cortez* v. *Ford Motor Co., supra,* at 114. Adequate review of this charge would require review of the substantive positions taken and policies pursued by the union in negotiating the resulting agreement. See *Vaca* v. *Sipes, supra,* at 181 (87 S Ct at 912, 17 L Ed 2d at 852–853). It is clear, however, that impartial intraunion review would not be available under such circumstances. The PRB is precluded by article 32, § 12 of the UAW Constitution from reviewing "in any way an official collective bargaining policy of the international union." Moreover, the PRB has adhered to a strict construction of the term "collective bargaining policy." *Appeal of John Considine* (1962), PRB Case No 73 (CCH, 62 ARB ¶ 8744, p 5718), "[I]t has even refused to make a determination as to whether the particular policy involved was articulated by reason of discriminatory motivations." Klein, "UAW Public Review Board Report" (1964), 18 Rutgers L Rev 304, 316. Under these circumstances, the intraunion review available is plainly inadequate.

The jurisdictional limitation of Article 32, § 12, would likewise bar review of many cases charging improper grievance processing. The claim of an individual worker may frequently have broad repercussions upon the union as an organization and upon other employees. Settlement of the claim necessarily involves delicate balancing of a multitude of interests, see Cox, "Rights under a Labor Agreement" (1956), 69 Harv L Rev 601, 606–616, balancing easily characterized as "collective bargaining policy." Review of the charge of unfair representa-

tion would again require review of the substantive positions taken by the union in its handling of the grievance.[13] *Vaca* v. *Sipes, supra,* at 181 (87 S Ct at 912, 17 L Ed 2d at 852, 853). Here too, intraunion review is inadequate.

In *Vaca* v. *Sipes, supra,* the court considered a contention analogous to that raised by defendants in this case. It was there urged that the existence of an administrative remedy, namely, review of a charge of unfair representation before the National Labor Relations Board, precluded judicial review of an employee suit for breach of contract and breach of the duty of fair representation. The Court rejected the contention. It was noted that the issues raised by fair representation suits require review of the substantive policies pursued by a union. Since such review was not normally within the jurisdiction of the Board, the Court concluded that courts were not precluded from exercising their traditional jurisdiction to curb arbitrary conduct by the individual employee's statutory representative. *Vaca* v. *Sipes, supra,* at 181–183 (87 S Ct at 912, 913, 17 L Ed 2d at 852, 853). *A fortiori,* since the PRB has no jurisdiction to review the substantive policies pursued by a union, we should not compel an aggrieved employee to engage in an exercise of futility.

Limitations upon the extent of the relief available through utilization of union appeal procedure also require that a court entertain plaintiff's action. It is true that in this case an intraunion appeal could remedy Local 155's bad faith conduct.[14] The redress

---

13 "If the PRB were to review official collective bargaining policies in the context of article 32 appeals involving grievance handling, it would be delving into the substantive aspects of the case before it." *Brooks, supra,* at 92, 93. "In respect to substantive issues, the PRB has unmistakably exhibited a reluctance to superimpose its judgment upon that of the international executive board and any subordinate bodies which earlier considered the matter. *Id.* at 94.

14 It is unlikely that intraunion review of plaintiff's grievance would involve review of the substantive position taken by the de-

provided might include damages for the full extent
of plaintiff's injury.  However, the gravamen of
plaintiff's complaint is breach of contract.  As in
*Vaca,* all or most of plaintiff's damages in this case
would be attributable to his allegedly wrongful dis-
charge by defendant Arrow.  Nevertheless, the em-
ployer could not involuntarily be made a party to
the intraunion appeal, since the PRB has no jurisdic-
tion over nonunion members.[15]  Because the govern-
ing principle in this case is apportionment of lia-
bility between employer and union according to the
damages caused by the fault of each, see *Vaca* v.
*Sipes, supra,* at 197 (87 S Ct at 920, 17 L Ed 2d at
862), it is doubtful whether in fairness Local 155
should be forced to pay for damage attributable only
to Arrow's wrongful discharge.

"These remedy problems are difficult enough
when one tribunal has all parties before it; they are
impossible if two independent tribunals with differ-
ent procedures, time limitations, and remedial pow-
ers, must participate." *Vaca* v. *Sipes, supra,* n 12
at 188 (87 S Ct at 915, 17 L Ed 2d at 856).

Only resort to a judicial forum offers plaintiff the
comprehensive and coordinated remedies necessary
to redress his injury.

In the present case, plaintiff's complaint raised
issues beyond the "plainly internal affairs" of the
union. See *National Labor Relations Board* v. *Indus-
trial Union of Marine and Shipbuilding Workers of
America, AFL-CIO, supra,* at 424 (88 S Ct at 1722,
20 L Ed 2d at 712).  I am led to this conclusion

fendant union in processing plaintiff's grievance.  The controlling
question would be one of fact, not policy; namely, did the union
take any position at all?  See also Cox, "Rights under a Labor Agree-
ment" (1956), 69 Harv L Rev 601, 613.

15 At the hearing on defendants' motions for accelerated judgment,
counsel for defendant union stated:  "I am not sure what would
happen if the company voluntarily submitted itself under our juris-
diction.  As far as I know, no company has ever done that."

because of the absence, as previously discussed, of
complete relief in an intraunion appeal. This, I be-
lieve, is the test we are to apply in determining
whether utilization of intraunion remedies is neces-
sary. See, Comment, "Exhaustion of Intraunion
Appellate Procedures Subjected to the Control of
the NLRB and the Courts," 1969 Utah L Rev 140,
151. Since plaintiff's complaint implicated not only
the union but also the employer, I would hold that
exhaustion of intraunion remedies was unnecessary.

"There cannot be any justification to make the
public processes wait until the union member ex-
hausts internal procedures plainly inadequate to
deal with all phases of the complex problem concern-
ing employer, union, and employee member. If the
member becomes exhausted, instead of the remedies,
the issues of public policy are never reached and an
airing of the grievance never had." *National Labor
Relations Board* v. *Industrial Union of Marine and
Shipbuilding Workers of America, AFL-CIO, supra,*
at 425 (88 S Ct at 1722, 20 L Ed 2d at 712, 713).

## II

### *Privilege*

I am of the opinion that defendant Arrow's com-
munication, if made in good faith, was qualifiedly
privileged.

It is the general rule that an employer is priv-
ileged if, in response to an inquiry from a prospec-
tive employer, he falsely reports the character of a
former employee, so long as that communication is
made in good faith.

"Statements made by a former employer of a serv-
ant, as to the character of the employee, are priv-
ileged when given to one interested in employing
the person defamed, since the circumstances are such

as to make it proper that the information be given."
1 Harper & James, Torts, § 5.26, p 447.

"It is permissible to warn a * * * prospective employer of the misconduct or bad character of an employee * * * ." Prosser, Torts, § 110 at p 807, 808.

The subject is extensively annotated in 66 ALR 1499.

In this case, the interest protected by the privilege is the interest of a prospective employer in not hiring thieves or those who are suspected in good faith of being thieves.

My colleagues cite *Bacon* v. *The Michigan Central Railroad Company* (1887), 66 Mich 166. In that case, defendant railroad employed agents at different points along its line who were authorized to hire men for defendant company. Plaintiff, an employee of defendant, was discharged for alleged theft. The company maintained discharge lists which were sent to all employing agents along the line. Plaintiff learned that his name was included on such a list with the annotation that he was discharged for stealing. Suit was commenced for an alleged libel. The Court held that the communication was qualifiedly privileged.

"If the agents of the defendant honestly believed that the plaintiff took the coat in question under the circumstances detailed to them, with the intention of appropriating it to his own use, the defendant is protected in having listed plaintiff as having been discharged for stealing." 66 Mich at 175.

In *Carroll* v. *Owen* (1914), 178 Mich 551, plaintiff alleged that her former employer had libeled and slandered her by reporting to her present employer plaintiff's disreputable character. It was there said at 553, 554;

"There is no controversy between counsel about the facts, neither is there any material variance between them as to the law. Both admit that the communications were qualifiedly privileged * * * .

"[I]t was defendant's right to inform her [plaintiff's present employer] as to [a former servant's] qualifications, morals, and habits, if she did so in good faith."

I think it clear that Arrow's letter of April 20, 1966 concerned plaintiff's "qualifications, morals, and habits." Since I am of the view that *Bacon* and *Carroll* are controlling, I would hold Arrow's communication qualifiedly privileged.

The trial court ruled that plaintiff's amended complaint failed to allege facts showing malice or facts from which malice might be inferred. The court was of the view that "the only allegation of actual malice is the conclusion without allegation of fact * * * ." This was error, since malice may be averred generally. GCR 1963, 112.2. There remains in this case, unlike the situation in *Carroll* v. *Owen, supra,* a controversy about the facts.

In his pleadings, plaintiff alleged that Arrow's communications were malicious, that Arrow knew the statements to prospective employers were false. This constituted an allegation of actual malice. *Arber* v. *Stahlin* (1969), 382 Mich 300. Nor has defendant Arrow challenged the genuineness of plaintiff's allegations, see GCR 1963, 117.2(3); it has merely asserted that its communication was made without malice. I would remand with the instruction that if at trial plaintiff can prove his allegation of actual malice, he is entitled to recover against defendant Arrow.