EVANS v F J BOUTELL DRIVEAWAY COMPANY, INC

1. CONTRACTS—WRITING—MODIFICATION—CONSIDERATION.

A written agreement may be the subject matter of subsequent oral modification provided the modification is supported by independent consideration such as a promised performance not already required by the original agreement.

2. CONTRACTS—TERMINATION—ORAL MODIFICATION—EVIDENCE.

Explicit contract language permitting cancellation of a lease on 30 days' notice must prevail over inconclusive evidence of oral assurances by defendant of the continued utilization of plaintiff brokers under lease-of-equipment agreements where the evidence convincingly demonstrates that defendant's statements of company policy regarding the retirement of plaintiffs on the basis of attrition were misread by plaintiffs as a guarantee of security which ran counter to the explicit contractual terms.

3. LABOR RELATIONS—COLLECTIVE BARGAINING—GRIEVANCE PROCEDURES—SUBJECT-MATTER JURISDICTION.

A court had subject-matter jurisdiction over disputed lease-of-equipment agreements before the plaintiffs had exhausted the grievance and arbitration procedures established by collective bargaining agreements where the grievance procedures anticipated only the award of monetary damages but the remedy sought by the plaintiffs was an injunction to prevent the defendant from terminating the lease agreements, and the agreements recognized that the lessor-lessee relationship was independent of the relationship between the company and its drivers.

Appeal from Genesee, John W. Baker, J. Submitted Division 2 February 8, 1973, at Lansing. (Docket No. 13623.) Decided July 24, 1973. Leave to appeal denied, 390 Mich 797.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 17 Am Jur 2d, Contracts §§ 466–468.
[3] 48 Am Jur 2d, Labor and Labor Relations §§ 1247, 1307, 1308, 1314.

Complaint by Glenn Evans and others against F. J. Boutell Driveaway Company, Inc., for injunction restraining termination by the defendant of a lease-of-equipment agreement. Permanent injunction for plaintiffs. Defendant appeals. Reversed.

*Bare & Brewer,* for plaintiffs.

*Matheson, Bieneman, Veale & Parr* (by *John W. Ester) (Russell E. Bowers,* of counsel), for defendant.

Before: BRONSON, P. J., and FITZGERALD and O'HARA,* JJ.

FITZGERALD, J. F. J. Boutell Driveaway Company, Inc. (hereinafter referred to as Boutell) is a Michigan corporation engaged in the business of transporting automobiles in interstate commerce as a common carrier by motor vehicle. The vehicles utilized are truck-tractors which fall into two categories: those owned by Boutell and driven by company employees, and those which are leased to Boutell from "owner-operators" pursuant to written lease-of-equipment agreements. This lawsuit stems from Boutell's exercise of a 30-day cancellation clause contained in the year-to-year lease agreements with owner-operators. The lower court awarded a permanent injunction to the plaintiffs reinstating the lease agreement on the basis that the plaintiffs relied upon alleged oral promises made to the lessors that they could continue to lease their equipment to defendant until they had died, retired, or were removed for cause. It is from this award of injunctive relief that defendant appeals.

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

This action was instituted by plaintiffs on December 30, 1970, when they filed their complaint for injunction restraining termination of lease-of-equipment agreement with the Genesee County Circuit Court. The trial court entered an order requiring defendant to show cause why a preliminary injunction should not issue. The testimony of several witnesses was heard, and on January 22, 1971, an opinion was issued indicating that the court would grant preliminary injunctive relief upon the posting by plaintiffs of a $25,000 bond.

Defendant filed a motion to dismiss and for accelerated judgment or, in the alternative, for summary judgment, contending *inter alia* that it was entitled to accelerated judgment under GCR 1963, 116.1(2), on the ground that the trial court lacked jurisdiction over the subject matter of the action in view of the availability of exclusive remedies which the appellees were actively pursuing under the collective bargaining agreement. This motion was denied.

An order of preliminary injunction was presented by plaintiffs on an *ex parte* basis and was entered by the court. Upon receipt of the order defendant filed a motion with the lower court for settlement of order and for stay of proceedings. The court heard the motion and agreed to modify, but not dissolve the preliminary injunction. Defendant was permitted to file an emergency application for leave to appeal and request for stay of proceedings with this Court. The lower court entered an amended order granting preliminary injunction and an order staying proceedings.

Defendant filed an emergency application for leave to appeal and motion for stay of proceedings with this Court seeking leave to appeal from the lower court's order denying defendant's motion to

dismiss and for accelerated judgment or, in the alternative, a summary judgment. This Court granted defendant's motion for immediate consideration, granted the application for leave to appeal and ordered the preliminary injunction entered by the trial court be dissolved. The Court further ordered the trial court to try the case on the merits at the earliest practical date, but not later than October 1, 1971. Plaintiffs subsequently filed a petition for reconsideration with the Court of Appeals and a petition for temporary restraining order with the lower court. The petition for reconsideration was not submitted for hearing before the Court of Appeals at that time, and the motion for a restraining order was denied by the lower court.

Trial of the case on the merits was commenced in the circuit court on August 25, 1971. Because of scheduling problems, it was impossible for the court to complete the trial before October 1, 1971, but the matter was set to be continued first on October 5 and then on October 13, 1971. On October 13, 1971, the trial judge voluntarily disqualified himself.

Plaintiffs filed another petition for reconsideration with this Court. The application for rehearing was denied, but the Court ordered that the case should proceed to trial on the merits on or before December 1, 1971. Pursuant to this Court's order, trial was commenced before another judge on November 19, 1971, and was concluded on November 29, 1971. The following day an opinion was rendered, issuing a permanent injunction against the defendant to provide for reinstatement of those plaintiffs who had retained ownership of their equipment. On January 31, 1972, the trial court entered an order of judgment and order of perma-

nent injunction in accordance with the court's written opinion. Also entered was an order staying proceedings until this Court acted upon a motion to be filed by defendant seeking continuance of the stay pending disposition of the appeal. As a condition to the entry of the order staying proceedings, appellant posted a stay bond in the amount of $25,000. On February 9, 1972, the lower court entered an order denying plaintiffs' motion for reconsideration and amendment of order of judgment. Defendant thereupon filed its motion to continue stay of proceedings dated February 18, 1972, which this Court granted by its order of March 3, 1972, upon condition that the $25,000 bond be continued.

Plaintiffs filed a motion for order allowing delayed cross-appeal which was granted by order of this Court dated July 28, 1972.

A brief history of the relationship between plaintiffs and defendant will illustrate the posture of the present conflict. Prior to World War II, Boutell utilized truck-tractors owned by the company as well as units leased from owner-operators in the conduct of its business. Following the war, the company increased the amount of owner-operator equipment in operation, and permitted company employees to become owner-operators by purchasing their own equipment. Because it was financially attractive for employees to lease equipment to Boutell rather than remain in its employ, there existed an abundant supply of company drivers desiring to become brokers. This trend continued until the economics of the industry required the company to reduce the number of brokers added, and eventually a point was reached in 1961 where new brokers were no longer engaged at both the Flint and Pontiac terminals.

In response to questions regarding the company policy with respect to hiring new brokers, Boutell indicated that no additional hiring would occur, and the present owner-operator fleet would be reduced by the process of attrition. Several plaintiffs testified that their understanding of defendant's policy was that brokers could remain in Boutell's employ as long as they could perform properly and until they retired, quit or died. Further testimony revealed that plaintiffs, in reliance upon defendant's representations, purchased additional equipment for lease and permitted other job opportunities to remain unexplored since they felt secure in their present employment.

Defendants denied making such statements, and further denied ever agreeing or promising *not* to exercise the 30-day termination clause in the lease agreements. Plaintiffs agreed that the company had exercised the 30-day clause to terminate owner-operators for bad performance, indicating their awareness of the 30-day termination provision, together with the belief that either party could terminate by giving proper notice.

During meetings held in the early 1960's owner-operators were warned both orally and in writing that their continued status as lessors had been endangered by loss of business to the railroads whose revenues had been considerably increased because of rail service development. The natural consequence of this development was to reduce revenues previously received by motor carriers. This turn of events affected not only Boutell, but virtually all automobile transporters in the industry. Following an analysis of the company's operating expenses, defendant concluded in the fall of 1969 that it could no longer profitably utilize its owner-operators, all of whom were paid a flat 65%

of gross revenues received from automobile manufacturers. It was not financially feasible to continue operating on 35% of the gross revenues generated since the profitable long-distance deliveries had been lost to the railroads.

Defendant, rather than terminate the lease agreements immediately, sought to provide the lessors with an opportunity to wind up their personal affairs and dispose of their equipment. Meetings were arranged on January 8 and 9, 1970 with owner-operators from terminals located in Flint and Pontiac. Company officials and brokers agreed that in return for a slight per-car reduction in their revenues, the company would agree not to terminate their leases until the end of the calendar year 1970. The proposal was accepted by the brokers at their respective meetings, was subsequently reduced to writing, and was submitted to and approved by the Joint Competitive Review Committee under the provisions of the collective bargaining agreement.

Defendant continued to utilize equipment leased from plaintiffs and other owner-operators during 1970. They purchased power equipment at a cost of approximately $1,000,000 to replace the tractors leased from brokers and those units in need of replacement. Pursuant to the January agreement, the company gave formal written notice to the owner-operators on November 23, 1970, that their leases would be terminated effective December 31, 1970.

The trial court made the following findings of fact:

(1) " * * * Boutell Company representatives by their statements induced plaintiffs to continue to work and lease their equipment until such a time that many of them would not be able to secure other employment.

Continuance of experienced employees on the job is a direct benefit to defendant company.

(2) "The action of the company in giving notice to terminate leases and then negotiating for a lower rate per car is evidence of the company's intent to vary the terms of the lease agreement; the company's 1970 offer of continuance of the lease with a concomitant $2.00 per car reduction in rate was accepted by plaintiffs."

The court voided the termination clause and ordered a permanent injunction requiring all lease agreements to remain in force for a period covering the duration of each of the plaintiff's preceding leases.

All lease-of-equipment agreements contained the following cancellation clause:

"This agreement is to take immediate effect and supersedes all prior written or verbal agreements between the parties hereto covering the same subject matter. This agreement shall remain in full force and effect for a period of one year from the date of execution unless sooner terminated by operation of law, by mutual consent of the parties hereto, by virtue of the provisions contained in this agreement, *or it may be cancelled by either of the parties hereto upon the giving of thirty (30) days' notice in writing to the other party.* In the absence of such cancellation and termination, this agreement shall automatically be renewable from year to year." (Emphasis supplied.)

Our first and primary inquiry requires review of the trial court's finding that the 30-day termination clause of the written lease-of-equipment agreements was modified by an oral agreement supported by independent consideration. *De novo* review of the facts yields a result contrary to the trial court's grant of injunctive relief.

A written agreement may be the subject matter of subsequent oral modifications provided the mod-

ification is "supported by independent consideration such as a promised performance not already required by the original lease". *Vickers v American Oil Co,* 26 Mich App 245, 252; 182 NW2d 592, 595 (1970). The trial court, while citing *Vickers* for the above proposition, has failed to explicitly set out either the terms of the alleged oral agreement which were breached by the defendants in their exercise of the termination clause or the consideration received by plaintiffs resulting from the cancellation. The most specific reference made in this regard is the following statement:

"In effect, the Boutell Company representatives by their statements induced the plaintiffs to continue to work and lease their equipment until such a time in life that many of them would not be able to secure other employment. Continuance of experienced employees on the job is a direct benefit to the defendant company."

Defendant submits that this finding is erroneous as a matter of law and cannot provide the basis for an enforceable oral contract. Further, defendant argues that the trial court findings with respect to the 1970 modification of the lease agreement are erroneous.

Uncontroverted testimony adduced at trial establishes that the 30-day lease termination clause was modified by agreement of the parties in January 1970. It reflected a forbearance on the part of defendants from exercising the termination clause until December of 1970 in consideration for a $2-per-car reduction in the rate paid to plaintiffs. Several of plaintiffs' witnesses testified that the modification terms were known and acquiesced in by the plaintiffs. The inconsistency between the lower court's ruling and the effect of the written modification becomes apparent. If plaintiffs truly believed that their agreements with defendant

could not be terminated, what purpose did the modification serve? Their very participation in the modification is tantamount to acknowledgement of their belief that the agreement could be terminated by defendant. This understanding is further supported by testimony of plaintiffs' witnesses indicating an awareness of the defendant's contractual right to cancel the broker relationship. Moreover, the 1970 modification agreement was submitted to and approved by the Joint Competitive Review Committee.

The lower court construes the 1970 agreement as evidence of a variation or waiver of the strict terms of the lease with respect to defendant's right to terminate the existing agreements. The court concluded that both plaintiffs and defendant have, by their actions, varied the terms of the individual written leases. The plaintiffs relied upon oral promises by granting assurances that they could continue as brokers, yet they failed to insist on a written amendment to the lease. Defendant's action of extending the termination date by modifying the written lease without securing amendments to that effect was said to vary the original agreement. On this basis the court issued a permanent injunction providing for reinstatement of lease agreements between the company and those brokers who had retained ownership of their equipment for a period equal to that of the preceding lease.

We conclude otherwise. The agreement reached on January 9, 1970, constitutes a valid bargained-for exchange. In return for a reduction in gross revenue received by plaintiffs of $2 and $4.50 per car for deliveries originating from the Pontiac and Detroit terminals respectively, defendant agreed to continue the contracts presently in effect until

December 31, 1970, without exercising the 30-day cancellation clause. The explicit contract language contained in this agreement must prevail over inconclusive evidence of oral assurances made by the defendant regarding the continued utilization of brokers. *Vickers, supra,* is distinguishable. There, the continuing tenancy of a lessee pursuant to a lease agreement failed to satisfy the requirement of consideration in return for lessor's promise to repair the premises. Plaintiffs' continued tenancy was already required under the original written lease. The instant case, as noted above, involves a written modification supported by independent consideration.

The evidence convincingly demonstrates that defendant's statements of company policy regarding the retirement of plaintiffs on the basis of attrition were misread by plaintiffs as a guarantee of security which runs counter to explicit contractual terms and the understanding held by Boutell. Plaintiffs' silence from the time the modification agreement was entered into until their complaint seeking injunctive relief was filed (a period exceeding 11 months) provides further indication in support of defendant's theory that both parties modified the original contract clearly stating the bargained-for exchange. Injunctive relief should not have been granted under these circumstances.

The final issue is whether the lower court established proper subject-matter jurisdiction. Defendants moved for accelerated judgment, arguing that the trial court lacked jurisdiction over a dispute seeking injunctive relief because the plaintiffs failed to exhaust grievance and arbitration procedures established by applicable bargaining agreements. *Alarcon v Fabricon Products,* 5 Mich App 25; 145 NW2d 816 (1966); *Harrison v Arrow Metal*

*Products Corp,* 20 Mich App 590; 174 NW2d 875 (1969); and *Pompey v General Motors Corp,* 385 Mich 537; 189 NW2d 243 (1971). The trial court denied the motion stating in his opinion:

"Although counsel for the defendant submits a series of cases, including *Teamsters v Oliver,* 358 US 283; 79 S Ct 297; 3 L Ed 2d 312 [1959]; *Republic Steel v Maddox,* 379 US 650; 85 S Ct 614; 13 L Ed 2d 580 [1965]; *Vaca v Sipes,* 386 US 171; 87 S Ct 903; 17 L Ed 2d 842 [1967]; *Glover v St Louis Railway,* 393 US 324; 89 S Ct 548; 21 L Ed 2d 519 [1969]; *Cortez v Ford Motor,* 349 Mich 108; [84 NW2d 523 (1957)] to establish the position that

'an employee may not resort to Courts before exhausting whatever remedies he may have under a grievance procedure established in the labor contract' *(Alarcon v Fabricon,* 5 Mich App 25)

nevertheless, it does not appear that the grievance procedure is anticipated by the parties to resolve the issue presented to this court.

"Section 5 of Article 7 of the National Master Automobile Transporters Agreement provides that:

'the Committees referred to above shall have the authority to order full, partial, or no compensation in deciding disputes and/or grievances and rendering awards.'

This wording appears to anticipate the awarding of monetary damages, where justified.

"This remedy is not sought by the plaintiffs in this cause. Rather, it is their prayer that an injunction be issued to prevent the defendant from terminating the lease between the parties."

The successor circuit court judge ruled in accord with the previous decision on this matter, though he did permit the defendant to make a separate evidentiary record in seeking to establish that the grievance procedures provided under the union-company agreement were the appropriate forum.

The trial court's observation that the grievance procedure is not anticipated by the parties to

resolve the issue presented to this Court was proper. That the court exercised proper subject-matter jurisdiction is supported by the following language appearing in the National Master Automobile Transporters Agreement, art 55, § 2:

"(a) It is further agreed by and between the parties hereto that in the event the Company leases equipment from individual owners or fleet owners, then in that event the Company shall pay the driver directly and separately from the lessor of said equipment. It is further agreed that should it become necessary for the Company to hire extra equipment, only Company employees shall be allowed to drive same.

"(b) The Employer expressly reserves the right to control the manner, means and details of, and by which, the owner-operator performs his services, as well as the ends to be accomplished."

The above clause governing the relationship between the company and owner-operators recognizes that the lessor-lessee relationship is independent of the relationship between the company and its drivers. The grievance procedure contemplated by the collective bargaining agreement did not have within its contemplation the instant dispute. This conclusion may be reached notwithstanding the fact that several plaintiffs have filed grievances under the union-company contract.

The grant of injunctive relief should be reversed. Costs to appellant.

All concurred.