Richard SAVAGE and Richard Savage
d/b/a Richard Savage Agency,
Plaintiffs,

v.

LINCOLN BENEFIT LIFE COMPANY,
Allstate Insurance Company, and Cindy Hoffman, Jointly and Severally,
Defendants.

and

Allstate Insurance Company,
Counter–Plaintiff,

v.

Richard Savage, Counter–Defendant.

No. 97–CV–10331–BC.

United States District Court,
E.D. Michigan,
Northern Division.

March 22, 1999.

Philip R. Sturtz, Saginaw, MI, for plaintiffs.

Mark K. Riashi, Detroit, MI, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CLAIM AGAINST DEFENDANTS AND GRANTING DEFENDANT ALLSTATE'S MOTION FOR SUMMARY JUDGMENT AS TO ITS COUNTERCLAIM AGAINST PLAINTIFFS

CLELAND, District Judge.

## I. Introduction

Plaintiff[1] originally sued three defendants—Allstate Insurance Company, Lincoln Benefit Life Company (a subsidiary of Allstate Insurance Company), and Cindy[2] Hoffman (an employee of Lincoln Benefit Life Company)—in the Tenth Circuit Court in Saginaw County, Michigan alleging defamation. Defendants removed the case to this court on September 17, 1997. On October 10, 1997, defendant, Allstate Insurance Company, filed a counterclaim averring breach of contract, conversion, misappropriation of trade secrets, and unfair competition. Pending before the court is defendants' motion for summary judgment on both the original claim and the counterclaim, filed on October 14, 1998. Plaintiff responded on November 19, 1998, to which defendants replied on December 2, 1998. A hearing was held on December

---

1. Plaintiff will be referred to as a single entity, although technically there are two plaintiffs.

2. The court notes that throughout the submitted documents the spelling of Ms. Hoffman's first name varies between Cindy and Cyndi.

9, 1998. The court then called for supplemental briefing on the issue of privilege; defendants filed a brief on December 21, 1998 and plaintiff replied with a letter on December 28, 1998.

## II. Background

On September 12, 1994, plaintiff Richard Savage became an employee of Allstate Insurance Company ("Allstate") by signing an Allstate R3000 Exclusive Agent Employment Agreement. Plaintiff's defamation claim is based on incidents which allegedly occurred in October and November 1996. Specifically, plaintiff collected $50.13 in cash from a client, Linda Burns, and in turn sent a check for $50.13 and an insurance policy application to defendant Lincoln Benefit Life Company ("Lincoln Benefit"). On November 5, 1996 Linda Burns contacted Cindy Hoffman, an employee of Lincoln Benefit, to inquire about the status of the insurance policy. At that time Cindy Hoffman communicated with Linda Burns in a manner that plaintiff characterizes as an accusation that he had kept or mishandled the money and was not eligible to sell the type of policy Linda Burns attempted to purchase. Plaintiff also postulates, without support, that such information could have been circulated to others.

The R3000 agreement expired, by its own terms, on April 1, 1996. On March 21, 1996, plaintiff signed an Allstate R3001 Exclusive Agency Agreement which, according to defendant Allstate, provides greater monetary rewards and changes the status of the signer from an employee to an independent contractor. The R3001 agreement contains a confidentiality and non-competition clause effective upon termination. Plaintiff also signed a separate Confidentiality and Non-Competition Agreement upon which defendant does not rely.

Approximately four months later, on February 27, 1997, defendant Allstate notified plaintiff that he would be terminated, effective June 1, 1997. According to defendants, the termination was not based on the incident involving Cindy Hoffman and Mrs. Burns; instead, defendants aver that plaintiff was terminated because he falsified documents and sold competitor's insurance products. Nonetheless, plaintiff was entitled to termination payments on condition that he adhere to the confidentiality/non-competition agreement found within the R3001 contract. Defendants further proffer that, after his termination, plaintiff sold competitor's products to people who were Allstate customers at the time of plaintiff's termination and/or to people plaintiff learned about through confidential Allstate information. Defendants additionally allege that plaintiff used Allstate's prepaid postage to sell competitor's products and for his own use. Defendants further aver that plaintiff violated his obligations by conducting business within one mile of the location in which he sold Allstate's products. Conversely, plaintiff argues that the R3001 agreement is invalid and, therefore, could not be violated.

## III. Standard

Under Rule 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Pro. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The existence of some factual dispute does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.

The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of its case upon which the non-moving party would bear the ultimate burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. But the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim. *Id.* at 323, 106 S.Ct. 2548. Once the moving party meets this burden, the burden passes to the non-moving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element necessary to its case with respect to which it bears the burden of proof. *Id.* The non-moving party must show that there is sufficient evidence for a jury to return a verdict in its favor, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (citation omitted), that is, that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant. *Id.* at 1478 (citation omitted). The non-moving party must present affirmative evidence on critical issues. *Id.* at 1477.

## IV. Discussion

### A. Plaintiff's Defamation Claim Against Defendant Allstate

Plaintiff possesses no first hand knowledge of the conversation(s) between Cindy Hoffman and Linda Burns. Hence, in trying to survive defendants' motion for summary judgment plaintiff relies almost exclusively on the deposition of Linda Burns regarding her telephone conversations with Cindy Hoffman. The relevant portions of Linda Burns's testimony are as follows.

Q. Was there any other conversation [on November 5th, 1996]?

. . .

A. ... Then [Cindy Hoffman] said she would get the money from Mr. Savage because according to her there was no money that she had received from Mr. Savage.

Burns Dep., Def.Ex. 3 at 17.

Q. Did [Cindy Hoffman] say anything about Mr. Savage keeping the money?

A. I don't know if she said that, I don't remember her, recall her saying that, but I just recall that she did say there was no money received from Mr. Savage. And I told her that we did give him a check. And she said there was nothing there in her office that she found that there was any money. So there was no policy written.

(*Id.*)

Q. And on November 5th did you have further conversation with [Cindy Hoffman] .... [Cindy Hoffman] told you apparently that Savage did not send her the money.

A. Right

Q. And you were to send [Cindy Hoffman] a copy of whatever you have given to Savage?

A. And then her company would send us the money and she would turn around and get the money from Mr. Savage.

(*Id.* at 18.) .

Q. Did [Cindy Hoffman] say anything else on that phone conversation on November 5?

A. Just enough to make me think that I didn't know who I was working with then, because I was very upset over the fact that Mr. Savage had told me that we had a policy and I'm talking to this lady, this Cindy Hoffman, and she's telling me we have no policy. And she didn't receive a check. And there was no moneys in her hand, so she said there is no policy.

(*Id.* at 18–19.)

Q. What were you thinking of Savage at this time?

A. I was really distrustful of him. I didn't really want him for an agent anymore because he was very—because the

way [Cindy Hoffman] talked he wasn't eligible to write up this policy.

(*Id.* at 20–21.)

Cindy Hoffman called Linda Burns on November 7th:

Q. Do you remember anything else that was said in that conversation....

A. Just that [Cindy Hoffman] said that they had found a check. And I was thinking that if she would have told me that in the first place, there wouldn't have been no problem. But she also told me that they were still checking into his eligibility to sell up this policy. And, according to Cindy Hoffman, we had no policy with Lincoln Benefit because Mr. Savage sold us a policy he wasn't supposed to.... I feel that Cindy Hoffman should have been 100 percent sure of what she told me that was exactly the way that should have—I mean, she should have known what she was saying before she told me anything. That's what I felt. Because they were very distrustful of Mr. Savage, we were ready to take all of our policies somewhere else.

(*Id.* at 24–45.)

Q. On this November 7th date conversation she still indicated to you that Savage still did not have the ability to write this policy, nor was he authorized to do that?

A. Yes, she did.

(*Id.* at 25.)

Q. Did she say anything else to you?

A. She was still checking into whether or not he had the right, but as far as she knew we had, there was no policy. She said we have not policy with them.

(*Id.* at 25.)

Q. ... Did [Cindy Hoffman] ever tell you that Savage had stole the money or kept the money ...

A. No, she never told me that.

(*Id.* at 27.)

Q. What, as result of this incident and what you heard and saw caused you to take your insurance business away from Mr. Savage?

A. What as a result? As a result of the life insurance policy, the trouble with this. We just didn't trust him.

Q. When you say you didn't trust him, what didn't you trust? That he had gotten the money or he had played games with the money or what did you—

A. I just didn't trust his—the way that this whole thing happened it was, you know, with the Lincoln Benefit what they said and what he said and everything being, you know, just completely twisted around. Just the opposite of what he said was going to happen. We were supposed to have a policy. Even though we did get the policy we went through a lot of trouble to get that policy.

Q. Did this conversation that you had with Cindy Hoffman was this of some importance to you, would she have told you about Savage and what he was doing?

A. Sure. She—made me very distrustful of him.

(*Id.* at 29–30.)

Q. Have you ever talked to anyone other than Mr. Savage or Miss Hoffman and those sitting in this room today about the conversations that you had with Miss Hoffman?

A. Well I did talk to the agent that I have now [Scott Meteva].

(*Id.* at 34.)

Q. What did you tell him about your conversations with Miss Hoffman?

A. ... I just explained to him what was happening. And he said he would get back with me, he was going to check into this.

Q. Did you ever speak to [Mr. Meteva] again about the Lincoln Benefit policy and these issues? A. Yes.

Q. When?

A. ... He called me back and said that—he said that he talked to—he didn't talk to Mr. Savage, but he said that there was definitely something wrong there. But he couldn't really give me any information other than the fact that there was something very wrong.

(*Id.* at 36.)

Q. Tell me as best you can what is it that led you to be distrustful of Mr. Savage?

A. What is it that led me to be distrustful?

Q. Yes.

A. The life insurance policy. Well, after my conversation with Lincoln Benefit, them telling me that there was no policy, them telling me he was not eligible to sell the policy, several things.

Q. Does that consist of everything that led you to believe that Mr. Savage was not trustworthy?

A. That, and he couldn't answer the questions. He couldn't answer why, you know, what was going on. He never had an answer. He said he was going to find an answer and we never—we just couldn't get to the bottom of it. And he just didn't seem to know either.

Q. When you say he could never answer the questions, you're referring to questions that you would have personally posed to him about what Lincoln Benefit was saying, right?

A. Right.

Q. And those questions were what?

A. That he wasn't eligible to sell the policy. That because he didn't have a license to sell it. And the check. I mean, there was no money they said they received.

(*Id.* at 44–45.)

Linda Burns's testimony provides the possibility, as alleged by plaintiff, that Cindy Hoffman made defamatory statements in two categories. First, stating or suggesting that plaintiff either stole or in some way inappropriately handled the money Linda Burns gave him to apply for an insurance policy. Second, stating or suggesting that plaintiff was unauthorized to accept an application for that particular policy. After discussing the standard for defamation, the court will address each category.

**1. Defamation Standard**

■ The law of defamation requires a plaintiff to satisfy four elements:

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication.

*Cole v. Knoll, Inc.,* 984 F.Supp. 1117, 1134 (W.D.Mich.1997); *see also Sawabini v. Desenberg,* 143 Mich.App. 373, 372 N.W.2d 559, 563 (Mich.Ct.App.1985). "These elements must be specifically pleaded and proved, including specific proof with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and publication." *Cole,* 984 F.Supp. at 1134.

■ Further, "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Sawabini,* 372 N.W.2d at 563–64; *see also Baggs v. Eagle–Picher Indus., Inc.,* 957 F.2d 268 (6th Cir.1992). Additionally, "an accusation of a commission of a crime is defamatory per se." *Baggs,* 957 F.2d at 273. Also defamatory per se is a "false and malicious statement[ ] injurious to a person in his or her business ... and special damages need not be alleged or proved." *Heritage Optical Center, Inc. v. Levine,* 137 Mich.App. 793, 359 N.W.2d 210, 212 (Mich.Ct.App.1984).

■ However, "the court may determine, as a matter of law, whether the words in question, alleged by plaintiff to be

defamatory, are capable of defamatory meaning." Sawabini, 372 N.W.2d at 563. Moreover, " '[w]here the words are, as a matter of law, not capable of carrying a defamatory meaning, summary judgment ... is appropriate.' " Baggs, 957 F.2d at 273 (citing Sawabini, 372 N.W.2d at 563).

## 2. Statements That Plaintiff Kept or Mishandled Money

As discussed in the previous section, plaintiff must satisfy four elements to prevail on his defamation claim. These elements will be addressed seriatim.

### a. "a false and defamatory statement concerning the plaintiff"

The first element of a defamation claim contains two parts—(1) a statement must be false and (2) it must be defamatory. At the time of the Cindy Hoffman/Linda Burns telephone conversation(s) plaintiff had, in fact, transferred the Burns's money to Lincoln benefit. (Pl.Br.Ex.5); (Def.Supp.Br. at 1, n. 1). Thus, any statements or implications by Cindy Hoffman that Lincoln Benefit had not received the money or that plaintiff had kept or mishandled the money were false. Thus plaintiff has satisfied the first part of element one.

A statement must also be proved defamatory. As noted earlier, "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Sawabini, 372 N.W.2d at 563–64. Moreover, the court may grant summary judgment "[w]here the words are, as a matter of law, not capable of carrying a defamatory meaning." Baggs, 957 F.2d at 273 (citing Sawabini, 372 N.W.2d at 563). The court determines that it is possible that plaintiff lost at least one customer, Linda Burns, because of Cindy Hoffman statements. Additionally, the court cannot conclude that Cindy Hoff-

man's words are incapable of "carrying a defamatory meaning." Id. Rather, Cindy Hoffman's words, as contained in the deposition of Linda Burns, are at least capable of being read as accusations of thievery or incompetence. There is, therefore, at least a genuine issue of material fact as to element one. See Gutierrez, 826 F.2d at 1536.

### b. "an unprivileged communication to a third party"

The second element of a defamation claim requires that the potentially defamatory statement (1) be unprivileged and (2) that it be communicated to a third party. Regarding the second part of this element, it is undisputed that Cindy Hoffman's statements were communicated to a third person, Linda Burns.

■■■ Regarding the first part of this element, whether or not a defamatory statement is privileged is a question of law. New Franklin Enterprises v. Sabo, 192 Mich.App. 219, 480 N.W.2d 326, 328 (Mich. Ct.App.1992); Peisner v. Detroit Free Press, Inc., 82 Mich.App. 153, 266 N.W.2d 693, 698 (Mich.Ct.App.1978); Lawrence v. Fox, 357 Mich. 134, 97 N.W.2d 719, 722 (Mich.1959). Defendants bear the burden of establishing a privilege. Lawrence, 97 N.W.2d at 722. The defendant has asserted no basis for an absolute privilege, such as a legislative, judicial or military privilege. Harrison v. Arrow Metal Products Corp., 20 Mich.App. 590, 174 N.W.2d 875, 884–85 (Mich.Ct.Ap.1970). There is basis, however, for a qualified or conditional privilege. In explaining how a court should determine whether a publication is privileged, the Lawrence court quoted from the Restatement of Torts § 619, comment a[3]. Lawrence, 97 N.W.2d at 722. Section 619 indicates that whether a publication is privileged is a question for the courts to decide and directs courts to §§ 585–599 of the Restatement of Torts for specifics.

---

**3.** Restatement of Torts § 619, Comment a, has been slightly changed since cited by the

Lawrence court. The changes, however, are not significant to the resolution of this matter.

*Lawrence,* N.W.2d at 722. The most current version of § 595[4] explains privilege as it is relevant to the case at bar.

> (1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
>> (a) there is information that affects a sufficiently important interest of the recipient or a third person, and
>>
>> (b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.
>
> (2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that
>
>> (a) the publication is made in response to a request rather than volunteered by the publisher or
>>
>> (b) a family or other relationship exists between the parties.

Restatement (Second) of Torts § 595 (1977). The court determines that the facts of the instant case are such that § 595 is advisory. Certainly the information as to whether the Burns's application money was transferred to Lincoln Benefit by plaintiff was an important interest to Linda Burns, the recipient of the information. In fact, the active status of a policy may be a putative client's most important interest when transacting business with an insurance company. Moreover, although Cindy Hoffman may not have been under a legal duty to publish the information to Linda Burns, certainly a good faith publication by an insurance company to a putative customer regarding the status of the receipt of a check or the issuance of a policy is "within generally accepted standards of decent conduct." *Id.* This is especially true since Cindy Hoffman was

"respon[ding] to a request," *Id.,* made by Linda Burns.

The elements of a conditional privilege have also been articulated as follows:

> The essential elements of a conditionally privileged communication may accordingly be enumerated as [1] good faith, [2] an interest to be upheld, [3] a statement limited in its scope to this purpose, [4] a proper occasion, and [5] publication in a proper manner and to proper parties only.

*Timmis v. Bennett,* 352 Mich. 355, 89 N.W.2d 748, 755 (Mich.1958). There is no evidence to suggest that Cindy Hoffman did not believe that what she was telling Linda Burns was true. Moreover, Cindy Hoffman indicated she would investigate the matter further and later, in fact, followed up with Linda Burns indicating that Lincoln Benefit had indeed received the check. Therefore, for purposes of determining whether a conditional privilege exists, the evidence suggests that Cindy Hoffman acted in good faith. In regard to an interest to be upheld, a

> "qualified privilege ... extends to all communications made Bona [sic] fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation."

*Harrison v. Arrow Metal Products Corp.,* 20 Mich.App. 590, 174 N.W.2d 875, 885–86 (Mich.Ct.App.1970) (citing *Bostetter v. Kirsch Co.,* 319 Mich. 547, 30 N.W.2d 276, 279–80 (1948)). Both Cindy Hoffman (Lincoln Benefit and Allstate) and Linda Burns were interested in an active insurance policy and Cindy Hoffman had at least a moral or social duty to inform Linda Burns, in good faith, about the receipt of application money. The evidence suggests, then, that

---

4. Restatement of Torts § 595 has also been updated since referenced by the Lawrence court. Such changes are also slight and of no significance to the resolution of the case at bar. The court will use the Restatement (Second) of Torts version in its analysis.

the statements made by Cindy Hoffman were limited in scope to whether or not money was received and to plaintiff's authority. Further, a private telephone conversation between a Lincoln Benefit employee and a putative customer, Linda Burns, was proper in occasion and manner. The court therefore determines, as a matter of law, that the conversation(s) between Cindy Hoffman and Linda Burns were covered by a conditional privilege.

 Once a conditional privilege has been established, it becomes a factual question for the jury to decide whether the defendant abused the privilege. *Lawrence*, 97 N.W.2d at 724. " 'The unreasonable exercise of privilege is an abuse of the occasion which defeats the protection otherwise afforded.' " *Id.* at 723 (citing Restatement of Torts, § 600, Comment a). Plaintiff bears the burden of proving abuse. *Id.* at 724. Abuse can be demonstrated in several ways, including the following: "lack of good faith"; "primary motive of hostility, spite, or ill-will" or " 'actual malice' "; or excessive publication. *Id.* (citations omitted). Moreover, because abuse is a question of fact, it is subject to summary judgment. The court has already determined as a matter of law that Cindy Hoffman acted in good faith. Further, plaintiff has proffered no evidence that Cindy Hoffman acted with hostility, spite, ill-will or actual malice. Lastly, the statement was published to only one person, one who had requested the information. The court finds, then, that no genuine issue of material fact regarding abuse of privilege exists. *See Gutierrez*, 826 F.2d at 1536. In other words, plaintiff failed to present evidence of a sufficient disagreement regarding abuse to require the case to be submitted to the jury. *See Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### c. "fault amounting to at least negligence on the part of the publisher"

The third element of defamation requires that plaintiff show at least negligence. As earlier noted, the Burns's money was transferred by plaintiff to Lincoln Benefit before the Cindy Hoffman/Linda Burns conversation(s). Cindy Hoffman, as a representative of Lincoln Benefit, at least arguably should have been aware of payment at the time of her conversation(s) with Linda Burns. This is particularly true in light of the fact that, according to Linda Burns's testimony, Cindy Hoffman later indicated the check was "found." (Burns Dep., Def.Ex. 3 at 24). Plaintiff has offered at least a material dispute as to negligence. *See Gutierrez*, 826 F.2d at 1536.

### d. "either actionability of the statement irrespective of special harm or the existence of special harm caused by publication"

Because plaintiff is alleging defamatory statements regarding his business, it is unnecessary for him to allege special damages. *Heritage Optical Center, Inc.*, 359 N.W.2d at 212.

### e. Summary

Although plaintiff has offered enough evidence to survive summary judgment as to the first, third, and fourth elements of defamation in the first category, he has offered no evidence creating a sufficient disagreement in regard to element two. *See Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505. The court has determined that a conditional privilege covers the statements made by Cindy Hoffman and plaintiff has offered no evidence showing abuse of this privilege which raises the issue to one of sufficient disagreement. *See id.* Accordingly, summary judgment will be granted for defendant as to any statements of thievery or incompetence.

### 3. Statements that Plaintiff was Ineligible to Sell Policy

Plaintiff is faced with the same four elements to prove his claim of defamation regarding his eligibility to sell the Burns's their insurance policy.

### a. "a false and defamatory statement concerning the plaintiff"

 Plaintiff has offered no particular evidence that statements made by Cindy Hoffman regarding his eligibility to sell the policy to Linda Burns were false. In fact, according to Linda Burns's testimony, she asked plaintiff about his ability to sell such a policy and did not receive a satisfactory answer. (Burns Dep., Def.Ex. 3 at 44–45). Therefore, plaintiff has failed to meet the first part of this element. Whether or not the statement was defamatory is subject to similar analysis as discussed by the court under the first category of defamation.

### b. "an unprivileged communication to a third party"

The court's analysis of privilege under the first category of defamation is equally applicable to statements under this category.

### c. "fault amounting to at least negligence on the part of the publisher"

Similar to the court's findings under category one, there is at least a genuine issue of material fact that defendant should have been able to explain to a customer an agent's authority.

### d. "either actionability of the statement irrespective of special harm or the existence of special harm caused by publication"

As noted under category one, it is not necessary for plaintiff to allege special harm or damages since the possible defamation is related to his employment. *Heritage Optical Center, Inc.,* 359 N.W.2d at 212.

### e. Summary

Although plaintiff offered sufficient evidence as to elements three and four to survive summary judgment as to the first category of defamation, plaintiff has offered no evidence creating a sufficient dis-

agreement in regard to elements one and two. *See Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. Specifically, plaintiff offered no evidence that Cindy Hoffman's statements regarding his eligibility to sell Linda Burns's the policy at issue were false. Further, the court has determined that a conditional privilege covers Cindy Hoffman's statements and plaintiff has offered no evidence of abuse. Accordingly summary judgment will be granted for defendant as to any statements of plaintiff's eligibility.

## B. Defendant Allstate's Claim Against Plaintiff

Defendant Allstate, in its counterclaim, alleges that plaintiff violated the R3001 agreement entered into by plaintiff and defendant Allstate. Plaintiff offers essentially two defenses in attempting to survive defendant Allstate's motion for summary judgment on the counterclaim. First, without support of proof or exhibits, plaintiff simply denies violating the agreement. Second, plaintiff claims that there was no valid R3001 agreement and, therefore, it could not have been violated. Hence, whether summary judgment is warranted turns almost entirely upon whether there was a valid R3001 agreement between plaintiff and defendant Allstate.

It is undisputed that an R3000 agreement was entered into by plaintiff and defendant Allstate and that it expired on April 1, 1996. It is also undisputed that plaintiff signed an Allstate R3001 Exclusive Agency Agreement and an accompanying Confidentiality and Non–Competition Agreement on March 21, 1996. As noted, however, defendant Allstate relies on the confidentiality/non-competition agreements within the R3001 agreement and not the separate Confidentiality and Non–Competition Agreement.

Plaintiff relies on the following arguments for his theory that the R3001 contract and the confidentiality/non-competition agreements are invalid: plaintiff signed the R3001 agreement at a sales

meeting while walking down the hall; plaintiff did not know what he was signing; plaintiff never received a copy of the document; the document was not dated by the agent signing on behalf of Allstate; an R3001 deals with a sole proprietorship and it was plaintiff's desire to form an insurance corporation—which would require an R3001A document.

 ■■■■ Plaintiff's arguments are unpersuasive. In regard to plaintiff's arguments that the document was signed between meetings and he did not know what he was signing, "[i]t is well established that a person cannot avoid a written contract on the ground that he did not attend to its terms, did not read it, supposed it was different in its terms, or that he believed it to be a matter of mere form." *Rowady v. K Mart Corp.*, 428 N.W.2d 22, 26 (Mich.Ct.App.1988); *see also United States v. Stump Home Specialties Manufacturing, Inc.*, 905 F.2d 1117, 1120 (7th Cir.1990) (citations omitted). Additionally, defendant Allstate provides a copy of a letter addressed to plaintiff, dated January 25, 1996, (Def.Ex.5), which discusses conversion from R3000 to R3001 which, if nothing else, gave plaintiff plenty of opportunity to learn about an R3001 before signing one. *See Rowady*, 428 N.W.2d at 25–26. Defendant Allstate also provides a copy of a letter from Allstate to plaintiff dated May 30, 1996 congratulating plaintiff on his conversion to an Executive Agent. (Def.Ex.9).

 Plaintiff's arguments that the document is invalid because he never received a copy of it and because his desire was to create a corporation rather than a sole proprietorship, are equally unpersuasive. Plaintiff provides no legal support for these arguments. Plaintiff also provides no legal support for his argument that signing the wrong type of confidentiality/non-competition agreement invalidates applicable portions. Moreover, the argument is moot as defendant Allstate is relying on the non-competition agreement found within the R3001 document in support of its claim for damages.

 Defendant Allstate, besides citing to *Rowady* and *Stump Home Specialties Manufacturing, Inc.*, and providing copies of letters regarding conversion from R3000 to R3001, provides copies of plaintiff's tax returns from 1995 and 1996. (Def.Ex.8). Defendant Allstate avers, and it is undisputed by plaintiff, that plaintiff's 1996 tax return reflects money earned on commission while his 1995 tax return reflects a salary. (Def.Ex.8). Defendant Allstate argues, at least implicitly, that R3000 employees earn a salary and R3001 agents earn commissions.

 Further, although plaintiff acknowledges the expiration of the R3000 contract on April 1, 1996, he continued representing Allstate under some arrangement after April 1, 1996. Therefore, the court determines that there is no genuine issue over the validity of the R3001 contract. *See Gutierrez*, 826 F.2d at 1536. In other words, plaintiff failed to present evidence of a sufficient disagreement regarding validity of the contract to require the case to be submitted to the jury. *See Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

 Defendant also presents thorough evidence that the contract was breached (Def.Br. at 14 to 20). For example, defendant Allstate provides the affidavits of Becky Carmona, Steve Butler, Joyce Schwab, and Craig Jean which attest that plaintiff switched their insurance policies from Allstate to Kemper without their permission. Defendant also provides a long list of people who allegedly left Allstate for competitors because of plaintiff's actions. Plaintiff offers no rebuttal evidence to refute the alleged breaches but relies solely on the alleged invalidity of the R3001 contract. Summary judgment, therefore, is appropriate.

 Defendant asks for a judgment in the amount of $44,405.30, an order that no further termination payments need be paid to plaintiff by defendant Allstate, and attorneys fees and costs. The $44,405.30

is the amount that defendant Allstate paid to plaintiff in the form of termination payments which, according to the R3001 agreement at XVIII(G), are to be reimbursed should the confidentiality/non-competition agreement contained within the R3001 agreement be broken. (Def.Ex. 1 at 9). The same portion of the R3001 agreement indicates that, upon breach, defendant Allstate is entitled to cease making termination payments. The court determines that such an award is appropriate. Fees and costs are to be submitted separately.

### V. Conclusion

Accordingly, IT IS ORDERED that defendants' motion for summary judgment as to plaintiff's claim against defendants is GRANTED.

IT IS FURTHER ORDERED that defendant Allstate's motion for summary judgment as to its counterclaim against plaintiff is GRANTED.

IT IS FURTHER ORDERED that plaintiff pay defendant Allstate $44,405.30 and defendant Allstate is entitled to cease making termination payments to plaintiff.